730 So.2d 479 (1999)
Ava Ann BURKETT
v.
CRESCENT CITY CONNECTION MARINE DIVISION, et al.
No. 98-CA-1237.
Court of Appeal of Louisiana, Fourth Circuit.
February 10, 1999.
Rehearing Denied April 14, 1999.
*480 Donald F. de Boisblanc, New Orleans, LA, and Catherine Leary, Westwego, LA, for plaintiff/appellee.
Richard P. Ieyoub, Attorney General, Gus A. Manthey, Jr., Assistant Attorney General, Louisiana Department of Justice, Litigation Division, New Orleans, LA, for defendants/appellants.
JONES, J.
Defendants/appellants, the Crescent City Connection Marine Division and the Louisiana Department of Transportation and Development, appeal the judgment of the trial court in favor of the plaintiff, an employee of the defendants. The trial court awarded the plaintiff $100,000 in damages, and denied the defendants'/appellants' Motion for New Trial and/or Re-argument. On appeal, defendants/appellants argue causation, excessive damages, and that the trial court did not render its judgment with reasons, because it only adopted the judgment and reasons verbatim, notwithstanding the fact that they were written by a non-litigant. We affirm.

STATEMENT OF FACTS
Plaintiff/appellee, Ava Ann Burkett ("Burkett"), was employed by the defendants/appellants herein, Crescent City Connection Marine Division and Louisiana Department of Transportation and Development *481 ("DOTD"). Burkett was employed as a deckhand/tolltaker aboard various ferries owned and operated by the defendants for the purpose of transporting passengers and vehicles across the Mississippi River. On October 31, 1994, Burkett was assigned to the Canal Street ferry that was in service to transport passengers and vehicles between the East and West Banks in the City of New Orleans. Her job duties included monitoring passengers and vehicles as they boarded or debarked from the vessel.
In order for passengers to go between the East Bank dock and the ferry, it was necessary for passengers to traverse a ramp from the dock to the ferry. This ramp was a two-part metal construction, hinged in the middle so that the two parts of the ramp would not grind or strike each other as the water level fluctuated. The evidence showed that there was a "gap" between the two hinged portions, which would become larger or smaller according to the water level of the river.
Immediately prior to the incident which gave rise to this litigation, the ferry was docked at the East Bank dock and passengers and vehicles began exiting the ferry. Burkett, who was stationed on the ramp, was assigned to monitor the passengers and vehicles. In order to accomplish her tasks, Burkett had to focus her attention on the traffic exiting the ferry while moving back and forth on the ramp in the area of the ramp's two-part hinge ("gap").
Contrary to ferry rules, a cyclist attempted to exit the ferry by riding down the ramp off the ferry, instead of walking his bicycle off. While waiting for the vehicles to enter/exit, Burkett noticed the bicyclist riding down the ramp, and called for him to get off the bike. Burkett walked down the ramp and ordered the cyclist to dismount, then she turned to signal other vehicles to exit. Once the bicyclist had stopped, Burkett turned, and as she turned, her left foot slipped into the gap sideways. Burkett's leg slid into the gap up to about her mid-thigh. The sides of her leg were scraped. Burkett testified that she immediately felt pain and reported to her supervisor that her leg/knee area was injured. Her supervisor made arrangements for emergency treatment at the Jo Ellen Smith Hospital emergency room.
This opening in the ramp is designed to allow the two-piece ramp to adjust with the constantly changing water level of the river. Burkett had been working as a deckhand/tolltaker for three months prior to the accident, and knew the purpose of the gap.
Burkett was examined by Dr. James Todd on November 2, 1994, only two days after the incident. She claimed that she felt some knee pain, which Dr. Todd subsequently assessed as strain. There was no swelling present. On November 9, 1994, she returned for a follow-up visit and Dr. Todd gave Burkett approval to return to work. On November 10, 1994, she returned to work performing deckhand duties from November 10 until November 30, 1994. She continued normal duties during December 1994 and January 1995. Although available to her, Burkett did not visit Dr. Todd during that time.
When Burkett's knee began to hurt in May 1995, she felt pain on the medial (inside) of the left knee, which was the opposite side of the knee that she felt pain in immediately after the October 31, 1994 incident. On November 20, 1995, Dr. Todd performed an arthroscopy of the left knee, one year after the October 31, 1994 incident. The arthroscopic examination revealed that there was an interposed plica, a fold of tissue that is sometimes a congenital condition in some persons. Because the plica might cause problems in the future, it was excised during the November 1995 arthroscopy. Both Dr. Todd and Burkett's subsequent treating physician, Dr. Charles Johnson, agree that the plica was not caused by trauma.
On January 3, 1996, Burkett was released to return to work by Dr. Todd. She worked January 1996 until February 6, 1996. On February 6, 1996, Burkett fell on a ramp while at work. Shortly thereafter, on February 9, 1996, Burkett also had an auto accident, where she ran into the rear end of a truck, injuring her chest. Burkett stayed out of work for 4-5 weeks. She sought treatment for back pain at the Bone and Joint Clinic on February 6, 13, and 20.
*482 Burkett worked in March and April 1996, and elected to visit Dr. Johnson at that time. Dr. Johnson diagnosed Burkett with a pes bursa in May 1996. He scheduled her for another arthroscopy in November 1996. Before the arthroscopy in November 1996, Burkett was involved in another accident in July 1996. On November 19, 1996, Dr. Johnson performed a second arthroscopy, and diagnosed Burkett with pes anserine bursitis of the left knee with traumatic chondromalacia of patella and chronic instability of the patella.
Burkett reported improvement in symptoms following the second arthroscopy. However, she still complains of occasional problems, and Dr. Johnson testified that she has a 25% permanent partial disability and can expect knee problems from time to time in the future. Dr. Todd and Dr. Johnson disagreed as to the cause of Burkett's ongoing knee problems and disability. Dr. Johnson testified that these problems result directly from the October 31, 1994 injury; whereas Dr. Todd believes that the initial knee injury was relatively minor and Burkett's on-going problems stem from some other cause, such as one of Burkett's subsequent accidents.
Burkett filed this suit claiming that her knee was damaged by the incident on October 31, 1994. Burkett's medical bills, to date, have been paid by the defendants. Her lost wages to the date of trial total $1,745.38. She is currently employed in a clerical capacity at wages equal to wages that she would have earned as a deckhand. Thus, she is not currently incurring a loss of wages. However, on January 29, 1998, the trial court found that Burkett sustained a 25% permanent partial disability of the lower extremity as a result of this incident, and this placed some limitation on Burkett's choice of future employment, such that she suffered a loss of earning capacity. She was awarded $100,000 in general damages, and after the motion for new trial and/or reargument was filed, the trial court denied this motion on February 19, 1998. This appeal followed.

CAUSATION/LIABILITY
The defendants argue that Burkett was negligent in causing her own injuries, and that the gap was not a defect, but to the contrary served the useful purpose of allowing the ramp to adjust to changing water levels. Defendants also contend that Burkett knew the gap was there and should have stepped over the gap. However, Burkett contends that she could not have possibly kept her eye on the gap while also performing her duties as a deckhand/tolltaker. We agree.
Burkett, advancing both unseaworthiness and negligence theories, also argued that the defendants were 100% at fault. She also asserted that the gap was dangerous, because the width of the gap changed in response to changes in the water level (the wake of a passing ship could alter the water level enough to change the width of the gap). At its widest, the gap was 4 inches or more across, posing a significant danger to the deckhands who were expected to walk on the ramp. Burkett also asserts that there had been a previous accident on the same ramp when a bicyclist's tire slipped into the gap. Therefore, Burkett argues that the gap was very large and a dangerous condition because the ramp was responding to changing water levels. A simple modification, such as placing a rubber mat over the gap, could have eliminated the danger. We agree.
After the accident, Burkett developed chronic knee problems (pes anserine bursitis and internal damage to the knee). She required two knee surgeries and has a 25% permanent partial disability.
The trial court found that Burkett appeared to be a truthful witness and that her testimony, regarding the manner in which her injury occurred and her symptoms and physical problems thereafter, were credible. The trial court also found that the testimony of Dr. Johnson regarding plaintiffs medical damages was credible.
The trial court also found that the defendants were negligent in permitting the gap to exist, and that such negligence rendered them liable under the Jones Act, 46 U.S.C.App. § 688, as interpreted in Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5 Cir.1997) (en banc). This finding of *483 fact by the trial court is supported by the record. The large opening at the hinged area of the ramp posed an unreasonable danger to Burkett and others, and the defendants could have and should have made simple modifications to cover, close or narrow the gap so as to render it less dangerous. There was no contributory negligence on the part of the plaintiff, because in order to effectively perform her job assignment, Burkett had to focus her attention on the traffic rather than on the gangway while at the same time moving back and forth on the ramp.
An appellate court generally reviews the factual findings of a trial court according to the manifest error standard of review. This standard has been best stated in Canter v. Koehring Co., 283 So.2d 716 (La.1973):
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter, at 724.
Also, in Revolta v. Barbe, 90-307 (5th Cir. 1991), 576 So.2d 1234, writ denied, 91-0873 (La.5/24/91), 580 So.2d 671, the Court stated:
Louisiana's ... court system allocates the fact finding function to the trial courts. Because of that allocation of function (as well as the trial court's normal procedure of evaluating live witnesses), great deference is accorded to the trial judge's factual findings, both express and implicit, and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment.
The Court of Appeal has a right to determine whether the trial court's judgment was clearly wrong based on the evidence, or clearly without evidentiary support. Levron v. State Through Dept. of Health & Hospitals, 94-2094 (La.App. 4 Cir. 4/24/96), 673 So.2d 279, writ denied, 96-1684 (La.10/4/96), 679 So.2d 1387, writ denied, 96-1723 (La.10/4/96), 679 So.2d 1391. Under the "manifest error/clearly wrong" standard of review, the Court of Appeal may not set aside the trial court's findings of fact unless those findings are clearly wrong in light of the record reviewed in its entirety. Mariner's Village Mandeville, Inc. v. Fama, Inc., 95-1867 (La.App. 4 Cir. 3/14/96), 671 So.2d 1015, writ denied, 96-0944 (La.5/17/96), 673 So.2d 615.
Factual conclusions of the trial court are entitled to great weight because the trial court is in a better position to evaluate the credibility of witnesses, and the reviewing court should not disturb those conclusions unless they are clearly erroneous. Mundy v. Dept. of Health & Human Resources, 609 So.2d 909 (La.App. 4 Cir.1992), writ granted, 613 So.2d 960 (La.1993), affirmed, 620 So.2d 811 (La.1993). It is within the sound discretion of the trial judge to observe the testimony and the demeanor of witnesses firsthand and to assess their credibility, and great deference is given to such determinations; thus, credibility determinations and factual inferences which are reasonably supported by evidence may not be set aside. Davis v. Schwegmann Giant Super Markets, 92-2051 (La.App. 4 Cir. 1/13/94), 631 So.2d 479.
The record supports the trial court's findings that Burkett has suffered on-going knee problems from October 31, 1994 to the date of trial, which required numerous physicians' visits, two arthroscopies, and physical therapy. Burkett has suffered from chronic pain and her activities have been limited in many ways. Burkett has a 25% permanent disability of the lower extremity and will suffer additional pain and medical problems in the future. The sum of $100,000 is a fair compensation for her past and future pain, suffering, disability, and loss of earning capacity, and this will not be disturbed on appeal.

*484 REASONS FOR JUDGMENT
Secondly, the defense argues that the record of this case shows that the trial court's Reasons for Judgment "are not the product of the district judge's mind, [and] are not the result of ... absorption of trial testimony and exhibits, ... weighing, evaluation, and assessment by ... judicial experience." Instead, the defense contends that the Reasons for Judgment are mechanically adopted from the plaintiffs proposed reasons for judgment, and therefore these "reasons" should not be accorded the usual deference or entitled to any weight under the usual appellate review standard.
The appellate standard of review in jury and non-jury trials are the same and the appellate courts are to decide whether the trial court's judgment was manifestly erroneous or clearly wrong. The Court of Appeal's function on appellate review is to determine whether evidence was sufficient for the trial court's factual findings, and whether those findings were clearly wrong. Allen v. Rawlins, 95-1592 (La.App. 4 Cir. 2/15/96), 669 So.2d 1282. Although deference is accorded to the fact finder, the Court of Appeal has a constitutional duty to review facts; appellate court[s] may not merely decide if it would have found facts of a case differently, but is mandated to affirm the trial court where that court's judgment is not clearly wrong or manifestly erroneous. Stewart v. Great Atlantic and Pacific Tea Co., 94-1592 (La.App. 4 Cir. 3/16/95), 657 So.2d 1327.
At the conclusion of trial, the judge asked the parties whether they wished to file post-trial memoranda, adding that, where post-trial memoranda are filed, the court's usual practice was to incorporate the prevailing litigant's memorandum in its Reasons for Judgment. The judge then inquired whether the parties wished to use this procedure, noting to both parties that it was "discretionary" and subject to their approval or objection. Plaintiffs counsel indicated that he would leave the decision to the defendants' attorney. The defense counsel indicated that he desired to file a post-trial memorandum, and voiced no objection to the trial court's proposed method of proceeding. Both parties filed post-trial memoranda, subsequent supplemental memoranda, and proposed reasons for judgment.
Through an error, plaintiffs counsel admits that he did not serve defense counsel with his proposed reasons and did not keep a file copy of the proposed reasons. However, the trial court entered judgment for Burkett in the sum of $100,000, and simultaneously filed its Reasons for Judgment which were an edited version of plaintiffs proposed reasons for judgment. Defendants argue that the trial court adopted plaintiffs proposed reasons for judgment verbatim. Defendants are in error.
The defendants contend that the manifest error rule does not apply in this case because of the improper and unethical actions of the trial court. They argue that the trial court failed to adequately articulate and support its reasons for judgment, because the court adopted the reasoning of a stranger to the trial of this matter. We find this argument to be without merit. There is no evidence in this record that the trial court made errors which interdict its fact finding process, negating the application of the manifest error standard.
Courts may adopt those findings submitted by one party and reject those of the other. In re Las Colinas, Inc., 426 F.2d 1005 (1st Cir.1970). "[T]he integrity of the judicial process demands (1) close scrutiny by the district court for accuracy from the standpoint of fact and law, plus (2) that degree of clarity which is necessary for a review of what is essentially the work of counsel." State of Florida v. Charley Toppino & Sons, Inc., 514 F.2d 700, 703, n. 7 (5th Cir. 1975).
The trial court treated plaintiffs proposed reasons as a rough draft; the court adopted much of petitioner's language but made numerous substantive and stylistic changes. An example of such changes may be found in the fact that the trial court deleted plaintiffs analysis regarding post-accident modifications. The court also elected not to review the issue of unseaworthiness put forth by the plaintiff, thus deleting all language in plaintiffs proposed reasons for judgment relating *485 to unseaworthiness. Although the trial court did quote plaintiff's summary of medical treatment verbatim, along with other adoptions of the plaintiffs proposed reasons for judgment, this action in itself does not constitute the trial court improperly abdicating its judicial function.
Although a trial judge might adopt most or almost all of a party's suggested reasons for judgment, the reasons and the judgment itself will stand as long as the record supports them. In Lancaster v. Petroleum Corp. of Delaware, 491 So.2d 768, 773 (La.App. 3 Cir.1986), the court stated:
Though it is not a common practice in Louisiana for the trial court to allow counsel to prepare the Court's reasons for judgment, it is an accepted practice. [See J. Lemmon's dissent in Miller v. Smith, 402 So.2d 688 (La.1981)]. This procedure is also permitted in Federal courts, and the United States Supreme Court has stated that where counsel has prepared the Court's reasons for judgment:
"Those findings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." United States v. El Paso Natural Gas Company, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964).
The practice of adopting a counsel's proposed Reasons for Judgment is followed and vigorously encouraged in all courts, both federal and state. Trial courts may draw upon many sources for its Reasons for Judgment, including the reliance on the prevailing parties' requests for relief. Courts are not mandated to only draw upon their own thoughts and ruminations. It is not error for the trial court to solicit and/or adopt counsel's proposed reasons for judgment. Therefore, this assignment of error is without merit.

DECREE
The ruling of the trial court, as well as the reasons for judgment, were supported by the record and the evidence presented. Accordingly, we affirm the judgment of the trial court and assess all costs of this appeal to the appellants.
AFFIRMED.