SANDRA CABRINA JENKINS, Judge.
| jThis is an appeal from a December 18, /2014 final judgment, ■ rendered after ■ a bench trial on the merits,, which dismissed an action for the .wrongful conversion of a crane boom filed by appellant, Bayou Fleet, Inc. (“Bayou Fleet”), against appel-lees, Bollinger Shipyards, Inc. and Bollinger Gulf Repair, L.L.C. (collectively, “Bol-linger”), on the grounds that Bayou Fleet’s claim was prescribed. The judgment also dismissed; with prejudice, Bollinger’s re-conventional demand against Bayou Fleet for fees for storing the crane boom, at Bollinger’s shipyard. In a separate appeal, Bayou Fleet seeks review of the trial court’s June 10, 2015 judgment taxing costs against Bayou Fleet in the amount of $19,794.50. In its Answer to that appeal, Bollinger requests an increase in the award of costs against Bayou Fleet.
For the reasons that follow, we affirm the' December 18, 2014 final judgment. With respect to the June 10, 2015 judgment taxing costs, we reduce the judgment by .$511.53, a deposition-related travel expense that is not taxable under La. R.S. 13:4533. We deny Bollinger’s request for an upward modification of the Raward of costs. We further vacate that portion of the judgment that reimburses Bollinger $11,754.41 in expert fees, and remand this matter for the limited purpose of conducting an evidentiary hearing on the issue of expert fees. : .
FACTUAL AND PROCEDURAL BACKGROUND
This lawsuit arises out of the scrapping of a more than 50-year-old crane boom that had been left for more than 15 years *801 in an isolated area at the south end of a shipyard located along the east bank of the Industrial Canal in New Orleans, Louisiana. At all relevant times, the leased property was owned by the Board of Commissioners for the Port of New Orleans (the “Port”).
The nearly 60-acre property between the Industrial Canal and Jourdan Road was leased in the early 1960s to American Marine Corporation (“AMC”), a company owned by Leslie Durant, the father- of Robin Durant and Peter Durant, who are the co-owners of Bayou Fleet, which owns a fleet of tug boats and Mississippi River barges. AMC operated a shipyard at the Jourdan Road site (the “Shipyard”). In 1993, AMC filed for bankruptcy. In 1995, in connection with the bankruptcy, AMC sold certain assets to Trinity Gulf Repair (“Trinity”), and Trinity assumed the' lease on the Shipyard. Later, Trinity sold and assigned the lease on the Shipyard to Halter Gulf Repair (“Halter”). In 2000, Halter sold and assigned the lease on the Shipyard to Bollinger.
The boom at issue was one piece of a three-part crane that at one time was owned by Cajun Crane Co, (“Cajun Crane”), a company owned by Leslie Durant. In 2003, Cajun Crane merged with Bayou Fleet, with Bayou Fleet as the surviving entity. There was testimony at trial that the boom- had been placed on pipe racks and left out in the open at the Shipyard since the late 1980s or early 1990s. The laother parts of the crane, including a cab and draw-works, were stored elsewhere and are not a part of this litigation.
After Hurricane Katrina devastated the New Orleans area in August 2005, the U.S. Corps of Engineers decided to close the Mississippi River-Gulf Outlet (“MR-GO”). Bollinger notified the Port in May 2006 that it wanted to terminate its lease on the Shipyard. By letter dated May 31, 2006, the Port agreed to terminate the lease as long as Bollinger completely cleared out the Shipyard. In late October 2007, Bol-lihger hired Tri-Native Contractors,, Inc. (“Tri-Native”) .and Franklin Services, Inc. (“Franklin Services”) to clear everything out of the Shipyard, including scrap and debris.. The large boom was cut into pieces, and hauled off the site for sale as scrap metal.
On March 16, 2009, Bayou Fleet filed a Petition for Damages against Bollinger asserting a single claim for wrongful conversion .of the boom. In the. Petition, Bayou Fleet alleged that, it owned the boom and had stored it at the Shipyard with Bollinger’s permission. Bayou Fleet asserted that Bollinger wrongfully destroyed the boom in November 2007 by cutting it up and allowing it to be sold for scrap, without Bayou Fleet’s knowledge, permission, or consent. Bayou Fleet also alleged that it did not discover that Bollinger had destroyed the boom until July 2008. Bayou Fleet sought damages in the amount of the full replacement value of the boom.
On April 8,-2009, Bollinger filed a Re-conventional Demand against Bayou Fleet, asserting that if Bayou Fleet owned the boom (which Bollinger denied), then Bol-linger was entitled to an award of storage fees for keeping the boom on the leased property. .
Lin February 2011, Bollinger filed an Exception of Prescription arguing that, because the Petition, on its face, alleged, that the boom was destroyed in November 2007, Bayou Fleet’s conversion claim was prescribed because the lawsuit was .not filed until March 16,-2009. In opposition to Bollinger’s Exception of Prescription, Bayou Fleet argued that it had learned through discovery that the boom was still in existence in 2008 and “in all likelihood, had not been destroyed until some point after March 15, 2008, less than a year *802 before Bayou Fleet, filed its lawsuit.” On January 20, 2012, the trial court denied Bollinger’s Exception of Prescription.
After a seven-day bench trial, on December 18, 2014, the trial' court entered a final judgment against Bayou Fleet and in favor of Bollinger, dismissing Bayou Fleet’s sole conversion claim, with prejudice. The judgment also dismissed Bol-linger’s Reconventional Demand, with prejudice. ■ The trial court’s judgment taxed costs against Bayou Fleet. On December 18, 2014, the trial court issued its detailed Findings of Fact and Conclusions of Law. The trial court found that Bayou Fleet’s conversion claim was prescribed. The trial court further found that Bollinger was not entitled to storage fees because there was no proof at trial that Bayou Fleet owned the boom.
On June 10, 2015, the trial court entered a separate judgment ordering Bayou Fleet to reimburse Bollinger for costs in the amount of $19,794.50. The trial court denied Bollinger’s request for reimbursement of $29,866.61 in additional costs. These consolidated appeals followed.
|,.DISCUSSION
Standard of Review
When prescription is raised by peremptory exception, with evidence being introduced at the trial on the exception, the trial court’s findings bf fact on the issue of prescription are subject to the manifestly erroneous or clearly wrong standard. London Towne Condo. Home-owner’s Ass’n v. London Towne Co., 06-401, p. 4 (La.10/17/06), 939 So.2d 1227, 1231. Where the fact-finder’s conclusions are based on determinations regarding the credibility of the witnesses, the manifest error standard demands great deference to the trier of fact because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Daniels v. Burridge, 00-1089, p. 3 (La.App. 4 Cir. 3/21/01), 785 So.2d 906, 909. The reviewing court must always keep in mind that if a trier of fact’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently. Id.
Trial Court’s Adoption of One Party’s Proposed Findings of Fact and Conclusions of Law
At the close- of the bench trial in late November 2014, the court instructed the attorneys for Bayou Fleet and Bollinger to each draft and submit their own proposed judgment, and proposed findings of fact and conclusions of law, by December 10, 2014, so that the court could “read and digest” them. Both parties agreed, and neither party filed an opposition to the other party’s proposed judgment or reasons for judgment.
| .Bayou Fleet argues that we should strictly scrutinize with a “jaundiced eye” the trial court’s Findings of Fact and Conclusions of Law because they are taken “verbatim” from Bollinger’s proposed findings of fact and conclusions of law, which Bayou Fleet argues are nothing more than “a self-serving brief’ from Bollinger’s attorney.
Courts may adopt those findings submitted by one party and reject those of the other. I.F. v. Admin. of Tulane Educ. Fund, 13-0696, p. 6 (La.App. 4 Cir. Cir. 12/23/13), 131 So.3d 491, 496. Although a trial judge might adopt most or almost all of the party’s suggested reasons for judgment, the reasons for judgment will stand as long as the record supports them. I.F., 13-0696 at p. 7, 131 So.3d at 497. See also *803 Wilfred v. A. Serv. Cab Co., 14-1121, p. 3 n. 3 (La.App. 4 Cir. 5/27/15), 171 So.3d 1007, 1010; Burkett v. Crescent City Connection Marine Div., 98-1237, p. 11 (La.App. 4 Cir. 2/10/99), 730 So.2d 479, 485. Because we find that the record supports the trial court’s findings, discussed fully below, we find no error in the trial court’s adoption of Bollinger’s proposed findings of fact and conclusions of law.
Prescription
Our threshold inquiry is whether the trial court erred in finding that, based on the evidence presented at the bench trial, Bayou Fleet’s claims were prescribed. As an initial matter, Bayou Fleet argues that, because the trial court deniéd Bollinger’s pre-trial exception of prescription, the issue of prescription was no longer one of the issues to be decided at trial. A peremptory exception may be urged at any time. Gettys v. Wong, 13-1138, p. 4 (La.App. 4 Cir. 5/7/14), 145 So.3d 460, 463. Thus, a party may re-urge a peremptory exception of prescription after a denial of the exception. Id. Accordingly, the trial court’s reconsideration of |7Bollinger’s exception of prescription, after a bench trial on the merits, was not in error.;
Bayou Fleet also argues that the trial court erred in finding that Bayou Fleet had the burden of proving that its conversion claim had not prescribed.
The tort of conversion is committed when a movable is destroyed. Dual Drilling Co. v. Mills Equip. Inv., Inc., 98-0343 (La.12/1/98), 721 So.2d 853, 857. A delictual action for conversion is governed by the one-year prescriptive period in La. Civ.Code art. 3492. Succession of Moore, 97-1668, p. 10 (La.App. 4 Cir. 4/1/98) 737 So.2d 749, 755.
Ordinarily, the party pleading an exception of prescription bears the burden of proof. Albe v. City of New Orleans, 14-0186, p. 5 (La.App. 4 Cir. 9/17/14), 150 So.3d 361, 366 (citing Spott v. Otis Elevator Co., 601 So.2d 1355, 1361 (La.1992)). If prescription is evident on the face of the pleadings, however, the burden shifts to the plaintiff to show that the action has not prescribed. Id. (citing Williams v. Sewerage & Water Bd. of New. Orleans, 611 So.2d 1383, 1386 (La.1993)).
Bayou Fleet alleged in its Petition that the boom was destroyed in November 2007. On its face, Bayou Fleet’s conversion claim has prescribed. Thus, the burden shifts to Bayou Fleet to show that its conversion claim is not prescribed.
At trial, Ben Bordelon, Bollinger’s Vice President of Repairs, testified that, after Hurricane Katrina ravaged the New Orleans area, and with the subsequent closure of MR-GO, Bollinger decided to close its facility on Jourdan Road in New Orleans, which ran along the Industrial Canal. Before it could do so, Bollinger’s lease with the Port required it to completely clear the yard; To comply with these obligations, Bollinger Gulf hired two contractors to demolish what was left of the | ¿yard after- Hurricane Katrina, and to remove all of the trash, debris, and 'scrap from the property. On October 26, 2007, Bollinger Gulf entered into an agreement with Tri-Native and-Franklin Services to demolish and clean the facility.
Franklin Services was responsible for the paperwork on the job (including negotiating scrap prices), while Tri-Native was responsible for the physical work. Joseph Dar dar, who owned Tri-Native, testified that the first work done on the demolition project — which began shortly after the agreement was confected in October 2007 — was the scrapping ’ of the crane boom. Mr. Dardar testified that he was present during the removal of the boom, which took about two weeks.
*804 Matthew Franklin, president of Franklin Services, testified that' his company began performing the scrapping work “almost immediately” after signing the contract in October 2007. Mr. Franklin testified that he watched the workers cut up the boom and put the pieces into boxes, which he said took about two weeks. Mr. Franklin also stated that Franklin Services left the demolition job on February 15, 2008, when the work was substantially complete.
Mr. Franklin testified that among the regularly kept business records of Franklin Services were the scrap tickets for the crane boom. These Scale Purchase Tickets show that four different loads of scrap metal were taken to a scrap recycling facility on November 9, 2007 and November 16,2007. Mr, Franklin identified his name on each of the scrap, tickets. Mr. Franklin testified that he was “100 percent positive” that these scrap tickets related to. the sale of the crane boom, and to the crane boom only.
In the trial court’s Findings of Fact, the court compared the 187,720 pounds of scrap metal sold by- Franklin Services on November 9 and 16, 2007, and the estimated weight of the boom — 173,978.43 pounds — that Peter Durant himself | ^calculated for purposes of valuing the boom. The trial court found that, assuming Peter Durant’s- estimate was accurate, the discrepancy was accounted for by the fact that the boom was sitting on pipe racks that had to be cut -up and scrapped also. The court concluded that even if a portion of these tickets represented additional steel to fill up the boxes, they clearly corroborated Mr. Franklin’s testimony.
The trial court also listened to the testimony of Dwight Harris, a former dock master for Bollinger Gulf, who said that the last work done on the project was to cut the boom and haul it off on the last day of June or the first day of July, 2008. Mr. Harris had a specific recollection that in late June he watched the workers cut up the boom and load it on a -truck. Mr. Harris-also testified that he believed that the boom was cut up in June 2008 because he kept a log of anything that came in and everything that went out. Mr. Harris admitted, however, that his log had been destroyed in a hurricane, so that it could not be introduced at trial.
Mr. Harris also testified that his recollection of the late June or early July 2008 time period- in which the boom was destroyed was also based on his observation that the boom had been tied to a particular dry dock, and that the boom was scrapped within 30 days after the dry dock left the Shipyard. Mr. Harris’s testimony, however, was contradicted by the testimony of Ben Bordelon, who testified that the dry dock left the Shipyard by mid-October 2007, and that the boom was scrapped shortly thereafter. Mr. Bordelon stated that he remembered this time frame because this work was completed around his son’s first birthday, October 17,2007.
The trial court found credible the testimony of Mr. Dardar and Mr. Franklin that the first work done on the project was the scrapping of the crane boom, and that the two men were positive that the boom was scrapped by November 2007. 1inThe trial court also found that the scrap tickets confirmed the time line established by their testimony. The trial court found that Mr. Harris’s recollectioh was “inexact,” and “refuted by the other witnesses’ testimonies,” including that of Mr. Bordelon.
The trial court also examined several photographs dated February 11, 2008, which showed the south side of the Shipyard, where the boom was kept. These photographs showed that, as of -February 11, 2008, the area had been completely cleared, with the dry dock -and the boom gone.
*805 Based on its assessment of the credibility .of the witnesses and the weight of the documentary , evidence,, the trial court found that the boom was fully destroyed no later than. November, 16, 2007, which was the date that prescription commenced. Accordingly, the trial court found that Bayou Fleet’s conversion claim had prescribed.
Where, as here, there exists conflict in the testimony, an appellate court may not substitute its own evaluations and inferences for the reasonable evaluations of credibility and inferences of fact by the fact-finder. Stobart v. State Through of Transp. & Dev., 617 So.2d 880, 882 (La.1993). Because two permissible views of the evidence exist, the trial court’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
Admissibility of Scrap Metal Tickets
Bayou Fleet argues that the trial court abused its discretion in admitting into evidence the scrap metal tickets, which the trial court relied upon in its ruling on the issue of prescription. Bayou Fleet argues that the scrap metal tickets were inadmissible because Mr. Franklin’s testimony that the scrap tickets were related to the boom was not based on his own personal knowledge. We disagree. Mr. | T1 Franklin testified that he personally observed part of the boom being cut up and placed into roll-off boxes. He also testified that he met the hauling truck at the scrap yard, and identified the truck driver and the box of scrap metal as being from the Shipyard demolition work. Mr. Franklin also testified that he gave the scrapyard employee his driver’s license information, which was on the face of the scrap tickets. We find that these scrap tickets were competent evidence for the trial court to consider in rendering its judgment.
Adverse Inference
Bayou Fleet also argues that the trial court erred in denying its Motion in Limine for Adverse Inference, which was related to the demolition contract between Bollinger, Tri-Native, and, Franklin Services. The copy of the demolition contract produced by Bollinger during discovery did not have an attached document which was referred to in the contract as “Exhibit 1.” No other party was able to produce a copy of. the contract with an attached “Exhibit 1.” At- trial, the court refused to admit the contract into evidence because it was incomplete.
Bayou Fleet contends that “Exhibit 1” would have set forth the numerical order in which each area of the Shipyard was to be cleared. According to Bayou Fleet, if • the boom had been kept in an area of the Shipyard designated in “Exhibit 1” to be demolished late in the project, then the exhibit would have shown that the boom was destroyed later than the time frame established by the other evidence. Bayou Fleet asserts that because Bollinger was unable to explain why the contract it produced in discovery did not have an attached “Exhibit 1,” the trial court erred in hot applying an adverse inference that the missing document established that the boom “was more probably than not destroyed” after March 16,2008.
|iaL. Clifton .Dickerson, general counsel for Bollinger, testified that he was responsible for keeping and maintaining all contracts. Mr. Dickerson testified that. he went through all of his files, and contacted Larry Brown, who supervised the demolition process, and neither- could find an original or a copy of an “Exhibit 1” to the demolition contract. At trial, both Mr. Dardar (of Tri-Native) ■ and Mr. Franklin (of Franklin Services) recognized their signatures on the contract, but neither could *806 recall whether there was an exhibit attached to the original.
The trial court is granted broad discretion in its ruling on evidentiary issues, such as motions in limine regarding spoliation of evidence, which will not be disturbed on appeal absent a clear abuse of that discretion. Everhardt v. La. Dept. of Transp. & Dev., 07-0981, p. 10 (La.App. 4 Cir. 2/20/08), 978 So.2d 1036, 1045. Bayou Fleet has pointed to no evidence in the record that supports a finding that Bollinger intentionally deprived Bayou Fleet of a purported copy of “Exhibit 1” for the purpose of depriving Bayou Fleet of its use, for example, in opposing Bollinger’s exception of prescription. See Tomlinson v. Landmark Am. Ins. Co., 15-0276, p. 10 (La.App. 4 Cir. 3/23/16), 192 So.3d 153, 160. Accordingly, we find no abuse of discretion.

Contra Non Valentem

Bayou Fleet alleged in its Petition that, even though the boom was destroyed in November 2007, Bayou Fleet did not discover this until July 2008. Louisiana jurisprudence has long recognized the doctrine of contra non valentem, a judicially created exception to prescription that is applied to ameliorate the harshness which would result from the strict application of prescription in certain situations. State Through Div. of Admin. v. McInnis Bros. Constr., 97-0742, p. 3 (La.10/21/97), 701 So.2d 937, 940. The four categories of contra non valentem are: (1) where 113there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action; (2) where- there was some condition coupled with the contract or connected with the proceedings which prevented the plaintiff from availing himself of his cause of action; (3) where the defendant himself has done some act effectually to prevent the plaintiff from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. Wells v. Zadeck, 11-1232, pp. 8-9 (La.3/30/12), 89 So.3d 1145, 1150.
The fourth category of contra non valentem is commonly known as the “discovery rule,” which Bayou Fleet relied on in its Petition. Santiago v. Tulane Univ. Hosp. & Clinic, 12-1095, p. 11 (La.App. 4 Cir. 4/24/13), 115 So.3d 675, 683. Under the discovery rule, it is not necessary for the plaintiff to have actual knowledge, as long as there is constructive notice. Jones v. State, 04-0717, p. 4 (La.App. 4 Cir. 9/29/04), 891 So.2d 698, 702. Knowledge sufficient to start the running of prescription is “constructive knowledge,” or the “ ‘acquisition of sufficient information, which, if pursued, will lead to the true condition of things.’ ” Wells, 11-1232 at p. 9, 89 So.3d at 1151 (quoting Marin v. Exxon Mobil Corp., 09-2368, pp. 13-14 (La.10/19/10), 48 So.3d 234, 246). “The ultimate issue'in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiffs action or inaction in light of his education, intelligence, and the nature of the defendant’s conduct.” Id. at pp. 9-10, 89 So.3d at 1151. Contra non valentem “will not exempt the plaintiffs claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to h4know what he could by reasonable diligence have learned.” Marin, 09-2368 at p. 13, 48 So.3d at 246. Because contra non valen-tem is an “exceptional remedy” in direct contradiction to the articles in the Civil' *807 Code, it must be “strictly construed.”[1] Harsh v. Calogero, 615 So.2d 420, 422 (La.App. 4th Cir.1993). Thus, the “discovery rule” of contra non valentem is only to be applied in “extreme circumstances.” Marin, 09-2368 at p. 12, 48 So.3d at 245.
The trial court found that, based on the evidence presented at trial, Bayou Fleet should have known, by exercising reasonable diligence, that the boom had been destroyed prior to the expiration of the one-year prescriptive period that commenced on November 16, 2007.
In deciding whether Bayou Fleet’s action or inaction was reasonable, we must consider the “education and intelligence” of Bayou Fleet’s two owners, Robin Durant and Peter Durant. Wells, 11-1232 at pp. 9-10, 89 So.3d at 1151. Peter Durant has a Bachelor of Science degree in chemical engineering, magna cum laude, from Lehigh University in 1974; a Master of Engineering degree in naval architecture and marine engineering from the University of California at Berkley in 1976; and a Master of Business Administration degree from the University of New Orleans in 1991. At the time of trial, Peter Durant had been , practicing marine engineering, mechanical engineering, and naval architecture for 40 years, including employment as the general manager of AMC from 1987 to 1995, and as the co-owner, vice-president and director of Bayou Fleet.
Robin Durant attended the University of Virginia for four years, pursuing a degree in architecture, although he did not obtain a degree. He began working for |1Khis father at AMC in 1978. Robin Durant is the co-owner, president and director of Bayou Fleet.
Bayou Fleet’s owners, Peter Durant and Robin Durant, are well educated, sophisticated businessmen with nearly 40 years of experience each in managing and owning marine businesses, which are factors that weigh against application of contra non valentem.
Bayou Fleet argues that it had been storing the boom at the Shipyard since at least 1991 without incident, and thus had no reason to suspect that anything would happen to the boom. Robin Durant stated that Bollinger never told him that the boom had to be moved, or that the boom was going to be destroyed. He said that if he had been told this, he would have moved the boom using a crane barge, which he said was the only way to move the heavy boom. He testified that he did not think it was necessary to move the crane unless Bayou Fleet was asked to do so.
Bayou Fleet also argues that it exercised reasonable diligence by visiting the site every 12 to 14 months to inspect the boom. Robin Durant agreed that the boom was easily accessible. Robin Durant testified that the boom was present during his inspection some time in 2007. Peter Durant testified that the boom was gone when he visited the site in July 2008. Peter Durant also testified that, prior to that 2008 inspection, he had not been to the Shipyard since 2005, before Hurricane Katrina, and that he had not seen the boom since 1996.
Bayou Fleet also contends that it would have been too burdensome for a representative of Bayou Fleet, a company that was located in Hahnville in St. Charles Parish, to travel back and forth from Hahnville to New Orleans “on almost a daily basis, and inspect its boom for damage.” Bayou *808 Fleet’s own expert calculated that the replacement value of the boom at the time that. it was; destroyed hfiwas $1,135,000. Although daily inspections were certainly not necessary, we find that Bayou -Fleet’s annual inspections, in light of the relatively short travel time to the Shipyard, and the $1.1 million value that Bayou Fleet placed on the boom, were unreasonable.
In August, September,- .and November 2007, the Times Picayune in New Orleans published several news articles announcing that Bollinger was terminating its lease with the Port, and closing its Shipyard on the Industrial Canal, because of the U.S. Army Corps of Engineers’ closing of MR-GO. Robin Durant testified that he: did not read these news articles at the time, and that they would not have put him on notice anyway that Bayou Fleet had to move its boom from the Shipyard. Robin Durant stated that if Bollinger was going to leave the Shipyard, he “would have expected Bollinger to have called us and asked us to move the boom.”
At trial, Steve McKinney, whose company was hired by Bollinger to lift heavy equipment that had drifted after Hurricane Katrina, testified that he knew for quite some time before the demolition began that Bollinger was leaving. Mr. McKinney also agreed that it was “pretty well known in the marine industry that Bollinger was leaving for a long time” because MR-GO was being closed.
It is difficult to conceive that Robin Durant and Peter Durant, with more than 40 years of experience in operating and owning marine businesses in New Orleans, would not have known — or could not have known with reasonable diligence — that the decimation of the shipping facilities along the Industrial Canal in August 2005 would ultimately force Bollinger to close the Shipyard and relocate its businesses, thereby putting Bayou Fleet on notice that it must remove its boom from the Shipyard.
117Both Peter Durant and Robin Durant also testified that Bayou Fleet never received a bill from Bollinger for storáge of the boom at the Shipyard. Robin Durant testified that it was his understanding that the boom was stored out of the way so that it.would not bother anybody, and was a benefit because it was used as a “dead man” to tie up barges. Robin Durant testified that it was Bayou Fleet’s understanding that it could leave the boom at the Shipyard “as long as it was out of the way,” and that the boom would be stored free of charge. He also stated that if he had received a bill from Bollinger he would have paid it and moved the boom from the Shipyard.
Peter Durant testified that in 2000, he met with Richard Ortega, then the general manager at Bollinger, to' discuss sandblasting and painting the boom. Peter Durant testified that he thought Bollinger had a crane large enough to move the boom, but Mr. Ortega said that Bollinger did not have a big enough crane, and that Bollinger was not interested in painting the boom anyway. Peter Durant testified that, because “it was going to cost- us a lot of money to pick it up and' move it,” he asked Mr. Ortega if Bayou- Fleet could just leave the boom. Peter Durant stated that Mr. Ortega said “that’s fine.”
Mr. Ortega, however, testified that he never had any conversations with the Du-rants regarding the boom, and that he never authorized anyone to store the boom at the Shipyard. Mr. Ortega testified that he only would have allowed customers to store property at the Shipyard, and that Bayou Fleet was not a Bollinger customer. Mr. Ortega stated that he did not recall the boom ever being used to tie up barges.
*809 | ^Lawrence Brown, who was Bollinger’s operations manager at the Shipyard beginning in 2000, and who became general manager of the Shipyard in November 2004, also testified that he never agreed to store the boom at the Shipyard.
Ben Bordelon, who was Bollinger’s Vice President of Repair, also testified that Bol-linger did not have an agreement with Bayou Fleet to store the boom at the Shipyard.
We cannot say that the trial court was clearly wrong in crediting the testimony of Mr. Ortega, Mr. Brown, and Mr. Bordelon, over that -of Peter Durant and Robin Durant, and finding that Bollinger did not have an agreement with Bayou Fleet to store the boom at the Shipyard.
We also must examine the reasonableness of Bayou Fleet’s action or inaction in the light of the nature of Bollinger’s conduct. Dwight Harris, who used to work for Peter Durant and his father at AMC, and who was Bollinger’s dock master, testified that when he learned that the boom was being scrapped within the next few weeks, he called Robin Durant three times over a period of more than a week. Mr. Harris testified that he left his phone number. Mr. Harris said that Robin Durant never returned his telephone calls.
In sum, we find that the trial court was not clearly wrong in concluding that Bayou Fleet did not make reasonable efforts to keep itself informed about the condition and security of its boom. Bayou Fleet abandoned the boom at the Shipyard for at least 16 years without using it, or paying for its storage. A yearly inspection of the boom was unreasonable, in light of the $1.1 million value of the boom to Bayou Fleet, the relatively brief travel time between Hahnville and New Orleans, and the ease of access to the inside of the Shipyard. It also appears that Bayou Fleet was eager to keep the boom at the Shipyard, free of charge, because of j lflthe large expense of moving the boom, which would require the use of a crane barge. And even though it was public knowledge in 2007 — and even more so within-the maritime industry in New Orleans — that Bollinger was closing down the Shipyard, Bayou Fleet did nothing, expecting Bollinger to tell Bayou Fleet when the boom had to be moved.
We find that Bayou Fleet’s ignorance of the destruction of the boom was attributable to its own lack of diligence or neglect. This case does not present the “extreme circumstances” needed to justify the application of contra non■ valentem to prevent the running of prescription until Bayou Fleet discovered in July 2008 that the boom had been destroyed. The trial court was not clearly wrong in finding that Bayou Steel did not satisfy its burden of proving that it did not have constructive knowledge that the boom had been destroyed prior to March 16, 2008, one year before the date the lawsuit was filed. Accordingly, the trial court did not err in concluding that Bayou Fleet’s conversion claim was prescribed.
Answer to Appeal: Bollinger’s Recon-ventional Demand
In its Answer to Appeal, Bollinger argues that if the judgment of the trial court is reversed, and Bayou Fleet is found to be the owner of the boom, then Bollinger is entitled to rental payments from Bayou Fleet under the doctrines of negotiorum gestor and quantum meruit. Because we affirm the trial court’s judgment, we do not address this issue.
Judgment Taxing Costs
Bayou Fleet argues that, if this court affirms the trial court’s December 18, 2014 final judgment, then this court should reduce the amount of costs awarded to Bollinger from $19,794.50 to $6,358.70.
*810 |2ftAs a general rule, the trial court has great discretion in awarding costs, and can only be reversed on appeal upon a showing of an abuse of that discretion. Certain St. Bernard Parish Gov’t Computer Disks v. St. Bernard Parish Gov’t ex rel. Ponstein, 13-1054, p. 3 (La.App. 4 Cir. 12/18/13), 130 So.3d 56, 58. This discretion is not boundless, however. Id. at p. 3, 130 So.3d at pp. 58-59.
La.Code Civ. P. art.1920 states that “[e]xcept as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.” This equitable power to allocate costs is limited to costs that positive law identifies as taxable. Ponstein, 13-1054 at p. 3, 130 So.3d at 59. Taxable costs are defined by La. R.S. 13:4533 to include “costs of the clerk, sheriff, witness’ fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court.” Id.
Bayou Fleet argues that the trial court abused its discretion in reimbursing Bol-linger $511.53 in travel costs to attend a deposition in Houston, Texas. We agree, and reduce the judgment by the amount $511.53. See Succession of Franz, 242 La. 875, 139 So.2d 216, 219 (1962) (travel expenses to attend a deposition do not properly come within the costs of depositions made taxable by La. R.S. 13:4533); Perry v. Odeco, Inc., 473 So.2d 312 (La.1985) (Mem.) (citing Franz ).[2]
Bayou Fleet also argues that the clerk’s fees should be reduced from $2,706.36 to $2,046.86, and that the sheriffs fees should be reduced from $1,473.82 to $965.46, because these fees were for severed third-party claims. We find no abuse of discretion. Delaney v. Whitney Nat’l Bank, 96-2144, pp. 18-19 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 721.
| g1Bayou Fleet also objects to the award of $11,754.41 in expert fees because the judge who taxed these costs, based on “nothing more than a spreadsheet,” was not the same judge who tried the case. Because the trial judge who taxed costs was not the same judge who conducted the bench trial, this is not the case where the trial judge who assessed costs was an “active participant” from “day one,” and “vividly remembered the trial,” in which case the trial court could have relied on its observations to assess costs, without further proof. Butler v. La. Mut. Med. Ins. Co., 15-1191, pp. 5, 12 (La.App. 4 Cir. 5/25/16), 195 So.3d 570, 578, 579, 2016 WL 3012579, at * *7, 8.
The “spreadsheet” submitted by Bollinger in its motion to tax costs is simply a list of invoices (not the invoices themselves) submitted by numerous vendors, including two companies owned by Bollinger’s expert marine surveyor, who issued an expert report and testified at trial. The “spreadsheet” reflects only the total amount of each invoice, and the correctness of the figures on the “spreadsheet” was attested to only by an affidavit executed by the office manager of Bollinger’s attorneys.
La. R.S. 13:3666(A) sets forth the general rule regarding the compensation of experts, which provides:
Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time em *811 ployed and the degree of learning or skill required. [Emphasis added]
Expert witness fees for testifying at trial and for time spent preparing for that testimony are recoverable. Bd. of Supervisors of La. State Univ. v. 1732 Canal St., L.L.C., 13-0976, at p. 12 (La.App. 4 Cir. 1/15/14), 133 So.3d 109, 119. The | ^amount actually billed by the expert is not determinative of the reasonable amount of taxable as costs. Id. The determination of the reasonableness of an expert fee award turns on the particular facts and circumstances of the ease. Id. at p. 12, 133 So.3d at 119-20.
Although it is a case-specific determination, courts have identified multiple factors to consider in determining a reasonable expert fee award, including the following: (1) the amount of time consumed by the expert in compiling his or her report; (2) the amount charged to the client; (3) the amount of time spent in preparing for trial; (4) the amount of time spent in court; (5) the expert’s expertise; (6) the difficulty of the expert’s work; (7) the amount of the award; and (8) the degree to which the expert witness’s opinions aided the court in its decision. Id. at pp. 12-13, 133 So.3d at 120. A litigant is only entitled to recover as costs the expert fees incurred directly in connection with the expert’s assistance at the trial. Buffman, Inc. v. Lafayette Ins. Co., 09-0870, p. 41 (La.App. 4 Cir. 4/14/10), 36 So.3d 1004, 1031. An expert may receive fees for work done in preparation for trial, but not for consultations assisting the attorney to prepare for trial. Id.
Here, Bollinger did not submit copies of the expert’s invoices, or an affidavit from the expert supporting his invoices. The “spreadsheet” submitted by Bollinger lists only the total amount of each invoice, without describing the nature and extent of the services performed by the expert. To verify or authenticate the invoice amounts, Bollinger submitted only an affidavit from its attorney’s office manager. Given the inadequacy of the record regarding the details of the fees charged by Bollinger’s expert witness, we cannot determine if the trial court’s judgment was an appropriate exercise or an abuse of discretion. Therefore, in the interests of justice, we vacate that portion of the trial court’s June 10, 2015 judgment that ^awarded $11,754.41 in expert fees, and remand this matter for an evidentiary hearing to determine the amount, if any, of expert fees based on the parties’ evidentiary support, and the criteria discussed herein.
Answer to Appeal: Motion to Tax Costs
In Bollinger’s Answer to Appeal regarding the judgment taxing costs, Bollinger argues that this court' should order an upward modification of the award. Bol-linger gives no reasons to support this request other than its belief that “the trial court ordered a lower amount of costs than the law entitles Bollinger to recover from Bayou Fleet.” We find that Bollinger has not shown an abuse of discretion by the trial court in denying Bollinger’s request for reimbursement of $29,866.61 in costs.
CONCLUSION
For the foregoing reasons, we affirm the trial court’s December 18, 2014 final judgment dismissing Bayou Fleet’s sole conversion claim against Bollinger, with prejudice, on the grounds that the claim prescribed. Because we affirm the trial court’s final judgment, we do not address Bollinger’s argument in its Answer to Appeal that, if Bayou Fleet is found to be the owner of the boom, Bollinger is entitled to an award of storage fees for keeping the boom at its Shipyard. With respect to the trial court’s June 10, 2015 judgment taxing costs in favor of Bollinger in the total amount of $19,794.50, we reduce the judg- *812 merit by $511.53, the amount improperly awarded for travel expenses associated with an out-of-town deposition. We find no abuse of discretion by the trial court in denying Bollinger’s request for reimbursement of $29,866.61 in other costs, Finally, we vacate that portion of the June 10, 2015 judgment awarding Bollinger $11,754.41 in'expert l^fees, and remand this matter to the trial court for the limited purpose of conducting an evidentiary hearing on the amount of expert fees, if any, to be awarded.
AFFIRMED IN PART, VACATED IN PART, REMANDED
BONIN, J., concurs with reasons.

. La. Civ.Code art. 3467 states that "[p]re-scription runs against all persons unless exception is established by legislation.”

. We note that the trial court properly denied Bollinger’s request for reimbursement of $974.50 in travel costs to attend a deposition in Boston, Massachusetts.