JUDGE SANDRA CABRINA JENKINS
*639 These two consolidated appeals arise from an expropriation proceeding brought by the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board") for the taking of property owned by Marshall F. Gerson. After the parties stipulated as to the compensation due for Mr. Gerson's land and improvements, a bench trial was held to determine the compensation, if any, due for business losses sustained by Mr. Gerson and his privately-held corporation, Ellvog, Inc. ("Ellvog"), resulting from the expropriation.
In No. 2017-CA-0229, the Board appeals the trial court's April 6, 2015 judgment awarding Mr. Gerson and Ellvog (collectively, the "Gerson Defendants") compensation in the amount of $558,475.00 for business losses caused by the expropriation. In No. 2017-CA-0296, the Gerson Defendants appeal the trial court's July 25, 2016 judgment denying them attorney's fees; and its October 14, 2016 judgment limiting their expert fees.
For the reasons that follow, we affirm in part, reverse and remand in part, and amend in part.
FACTUAL AND PROCEDURAL BACKGROUND
Ellgee Uniform Shop ("Uniform Shop"), the business operated on the expropriated property, was established in 1939 by Mr. Gerson's parents in the 1700 block of Tulane Avenue. In 1974, the business was relocated one block away to its location at the time of the taking, 1831-35 Tulane Ave. (the "Property"). The Uniform Shop was a well-established retail uniform supplier to the healthcare, hospitality, and religious communities, and was located in the "heart" of the New Orleans downtown hospital district, which included Charity Hospital, the VA Hospital, and Tulane University Medical Center. Ellvog owned the Uniform Shop. Mr. Gerson owned the building and the land on which Ellvog operated the Uniform Shop. Mr. Gerson also was a salaried employee of the Uniform Shop, and was the sole shareholder of Ellvog. Mr. Gerson did not charge Ellvog rent.
In 2008, Mr. Gerson became aware of expropriations taking place in the foot print of a new downtown medical complex development to replace Charity Hospital and the VA Hospital. Mr. Gerson began searching for comparable property within a one-half-mile radius of his business. In 2009, Mr. Gerson engaged the services of Mark Herman, a real estate broker, to assist in finding a comparable property that could replace the business's unique location on Tulane Avenue. Mr. Herman reported that there was no comparable property available because the expropriation was causing the market to become "choked off" and "stagnant," with the result that available property was too expensive. In April 2011, Mr. Gerson relocated the Uniform Shop into a leased building more than a mile away at 3101 Tulane Ave., which was formerly occupied by an auto repair business. Ellvog paid the landlord monthly rent of $2,500.00.
On March 11, 2011, the Board filed a Petition for Expropriation of the Property, and deposited $365,000.00 into the registry of the court as the estimated amount of just compensation. On March 28, 2011, the Gerson Defendants filed an Answer and Reconventional Demand seeking additional compensation, including: (1) "value in use" of the Property; (2) inconvenience and delay damages; (3) judicial interest on those inconvenience and delay damages; (4) past and future loss of income; (5) specific expenses incurred in connection with the Board's expropriation actions, including *640 professional fees and advertising costs; (6) expenses of a temporary location of the business; (7) leasehold expenses for a temporary location; and (8) the incremental costs of replacement property (land and building). In October 2011, the Gerson Defendants withdrew the $365,000.00 from the registry of the court, with full reservation of their rights to any further compensation.
On October 13, 2013, the Board filed a Motion for Summary Judgment with respect to the amount of "just compensation" owed to the Gerson Defendants. On October 21, 2013, the Gerson Defendants filed an opposition to the Board's Motion for Summary Judgment, arguing that there were genuine issues of material fact as to whether they had been compensated to the full extent of their loss. After a hearing on October 28, 2013, the trial court rendered a December 10, 2013 judgment granting in part, and denying in part, the Board's Motion for Summary Judgment. The trial court granted summary judgment with respect to the fair market valuation of the expropriated Property (land and improvements), which the parties had stipulated to be $365,000.00. The trial court denied summary judgment with respect to a determination of any additional compensation due to the Gerson Defendants.
Because the parties had stipulated that the fair market value of the Property was $365,000.00, "[t]he only issue for the court [was] the business economic loss resulting from the expropriation of [the Property] and resulting relocation of [the Uniform Shop]." A bench trial was held on January 12 and January 13, 2015. On April 6, 2015, the trial court rendered a judgment in favor of the Gerson Defendants in the amount of $558,475.00 as compensation for the business losses caused by the expropriation.[1] The judgment provided that each party was to bear its own costs.
On April 13, 2015, the Gerson Defendants filed a Motion for New Trial, seeking to recover attorney's fees, expert fees, and costs. On July 25, 2016, the trial court rendered a judgment in which it amended its April 6, 2015 judgment by awarding the Gerson Defendants court costs in the amount of $2,120.89, and copy and printing costs in the amount of $4,113.98. The July 25, 2016 judgment denied the Gerson Defendants' Motion for New Trial with respect to their request for attorney's fees.
Thereafter, the trial court conducted a hearing on the issue of expert fees. The Gerson Defendants sought $59,985.00 for their two testifying experts. In a judgment dated October 14, 2016, the trial court awarded the Gerson Defendants $9,000.00 in expert fees.
The Gerson Defendants appealed the July 25, 2016, and October 14, 2016 judgments denying attorney's fees, and awarding only $9,000.00 in expert fees. The Board appealed the trial court's April 6, 2015 judgment awarding the Gerson Defendants $558,475.00 as full compensation for business losses sustained as a result of the taking.
DISCUSSION
Expropriation Under Louisiana's Constitution
In general, "expropriation proceedings derogate from the right of individuals to own property"; thus, "the law governing these proceedings is strictly construed *641 against the expropriating authority." Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. College v. Villavaso , 14-1277, p. 7 (La. App. 4 Cir. 12/23/15), 183 So.3d 757, 763.
Prior to the 1974 revision of the Louisiana Constitution, Louisiana courts limited compensation for expropriation to damages reflected in the value of the property taken. See Tracy Lee Howard, Compensating an Owner to the Full Extent of His Loss: A Reevaluation of Compensable Damages in LouisianaExpropriation Cases , 51 LA. L. REV. 821, 822 (March 1991) (hereinafter, Howard, Louisiana Expropriation Cases ). The Louisiana Constitution of 1921 had simply required payment of "just compensation" for an expropriation, and the owner could only receive fair market value and any severance damages for the property taken through expropriation. LA. CONST. of 1921, art. 1, § 2. Thus, damages were not awarded to compensate the landowner for incidental losses he personally may have suffered as a result of the taking. Howard, Louisiana Expropriation Cases .
In 1974, however, the Louisiana Constitution was rewritten to provide that a landowner in an expropriation case "shall be compensated to the full extent of his loss ," and that "the full extent of his loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred because of the expropriation ." LA. CONST. art. 1, § 4 (emphasis added). "This has been interpreted to mean that a landowner whose property is expropriated is entitled to be placed in the same pecuniary position in which he would have been if the property had not been taken ." Villavaso , 14-1277, p. 7, 183 So.3d at 763 (emphasis added).
" Article 1, § 4 does not specify how to fully compensate a landowner whose property is taken." State, Dept. of Transp. & Dev. v. Dietrich , 555 So.2d 1355, 1358 (La. 1990). The Louisiana Supreme Court, however, has declared that full compensation includes loss of profits from the taking of business premises, so that landowners are compensated for their full loss, not merely for the loss of their land and improvements. South Lafourche Levee Dist. v. Jarreau , 16-0788, 16-0904, p. 10 (La. 3/31/17), 217 So.3d 298, 306, cert. denied , --- U.S. ----, 138 S.Ct. 381, 199 L.Ed.2d 279 (2017). The Louisiana Supreme Court also has extended business losses to include not only present losses, but also estimated future business losses. Dietrich , 555 So.2d at 1359.
Applying these principles, we will first discuss the Board's appeal, which challenges the trial court's award of $558,475.00 to the Gerson Defendants as compensation for business losses resulting from the expropriation.
COMPENSATION FOR BUSINESS LOSSES IN EXPROPRIATION CASES
Burden of Proof
When a landowner challenges the amount deposited for compensation, he must prove a greater value by a preponderance of the evidence. Dietrich , 555 So.2d at 1359. "Proof of economic losses may be determined by various methods, and it may exceed the market value of the property." Id. "However, the method employed for proof of loss must demonstrate by a preponderance of the evidence that an actual loss was sustained by the business because of the taking." Id.
Standard of Review
In an expropriation case, " '[a]s in other areas of remedy where damages *642 are not susceptible to scientific measurement, the trial court is given wide latitude and great discretion in ascertaining the precise amount due to an injured property owner.' " Villavaso , 14-1277, p. 15, 183 So.3d at 767 (quoting State, Dept. of Transp. & Dev. v. Sonnier , 503 So.2d 1144, 1146 (La. App. 3d Cir. 1987) ). " '[T]he trier of fact's factual determinations as to the value of property and entitlement to any other damages in an expropriation proceeding will not be disturbed on appeal absent ... manifest error.' " Id. , 14-1277, p. 6, 183 So.3d at 762 (quoting Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. College v. 1732 Canal St., L.L.C. , 12-1370, p. 3 (La. App. 4 Cir. 6/19/13), 159 So.3d 470, 472 ).
Mr. Gerson's Testimony
At trial, Mr. Gerson testified that, prior to the taking, his Uniform Shop located at 1831 Tulane Ave. was in the "bulls-eye" of the medical center of New Orleans. He stated that the location was ideally suited for the type of merchandise he sold - namely, medical uniforms (approximately 50% of sales); hotel-service industry uniforms (approximately 30-35% of sales); and choir robes, judicial robes, and clergy apparel (approximately 15-20% of sales). Mr. Gerson described his business location as "unique":
1831 Tulane Avenue was about as unique and a great location as anyone in my particular unique nitch [sic] business could want, not only was it across the street from hospitals, not only had it been in business for over 70 years in the same location, ... not only was it truly accessible to public transportation, not only was it very[,] very close to the, not only the medical profession but also the tourist industry. My location, as the term goes, location, location, location, epitomizes that sentence.
Mr. Gerson also testified that after Hurricane Katrina in 2005, only two or three businesses in the area reopened. According to Mr. Gerson, when LSU announced that a new hospital was being built in the area, the neighborhood became blighted, and the Board began acquiring buildings in 2008, and tearing them down in 2009 and 2010. Mr. Gerson stated that "[i]t got to a point where I was a free standing business in the middle of a construction zone."
Expert Albert S. Pappalardo
The Gerson Defendants retained Albert S. Pappalardo, a Louisiana Certified General Real Estate Appraiser, as an expert. Mr. Pappalardo's expert report stated that: (1) the single most important factor in finding comparable property was replication of the taken property close to the medical complex; and (2) the payment of the fair market value of the Property alone, because of the unique location of the Property within the footprint of the planned medical complex, was not sufficient to fully compensate Mr. Gerson for his business losses. According to Mr. Pappalardo, because of the confluence of the special factors unique to this location, the "most equitable way to make the property owner 'whole' [was] to allow for the reproduction or replication of the business enterprise" in a location as close to the original location as practical. Although Mr. Pappalardo advocated a "replacement" cost approach, he emphasized that "finding a replacement property in the current environment that has most if not all of the attributes of the subject property could very well be an impossibility."
Expert Michael A. Daigle
On February 4, 2010 (prior to the expropriation suit), the Board's expert, Michael A. Daigle - whom the Board did not call to testify at trial - issued a "Business Evaluation Report" for Ellvog, d/b/a Ellgee Uniforms. Mr. Daigle is a certified *643 public accountant ("CPA") and is certified in financial forensics. According to Mr. Daigle's report, which was introduced at trial, the Louisiana Constitution's reference to the "full extent of his loss" focuses not on the fair market value of the assets taken, but instead personalizes the analysis by focusing on the fair value of the owner's pecuniary position in those assets taken, or the fair value of the owner's discretionary cash earnings derived from the assets taken. Mr. Daigle opined that the most universally appropriate model to use for the valuation of a small, closely held, for-profit business enterprise was an "income" approach, which was particularly appropriate because Louisiana's constitutional mandate is to value the pecuniary (cash) position of the owner in the assets taken.
In his report, Mr. Daigle estimated that the reasonable fair value of the owner's pecuniary position in Ellvog on December 31, 2009 was $361,500.00, which included all the company's net tangible and intangible productive assets. Mr. Daigle stated that he calculated his valuation estimate by capitalizing a projected $63,250.00 in "Discretionary Cash Flow to Owner" ("DCF") by a risk appropriate rate of 17.5%. According to Mr. Daigle, this rate was determined by the "build-up method" in which a risk-free rate, usually the U.S. long-term Bond rate, is adjusted for several business risk factors. To obtain his projected short-term annual DCF of $63,250.00, Mr. Daigle studied Ellvog's reported annual operating revenues and expenses for fiscal years ending May 31, 2004, 2005, 2006, 2007, 2008, and 2009, and adjusted these amounts for non-cash items and personal benefit expenditures.
Expert Ralph J. Stephens
The Board's expert at trial was Ralph J. Stephens, who is a CPA, an attorney, and is accredited in business valuation and certified in financial forensics. In the four years prior to this action, Mr. Stephens testified as an expert in 15 matters. Mr. Stephens was asked by the Board to determine whether any additional damages were due to the Gerson Defendants as a result of the expropriation.
Mr. Stephens testified that there are three approaches to business valuation: (1) an asset approach; (2) a comparable company approach; and (3) an income approach. Unlike Mr. Daigle, Mr. Stephens concluded that the loss of income approach was not appropriate in this case. According to Mr. Stephens, if profits have been lost for a short period of time, the loss of income approach is used. Mr. Stephens stated that if, however, profits are lost in perpetuity, the business has been a loss, so the asset approach is used. Mr. Stephens opined that the uniform business was never profitable between 2004 and 2009 and, after the taking, it had no valuation. Using the assets approach, Mr. Stephens concluded that the value of a 100% interest in Ellvog as of December 31, 2009 was $39,806.00, which was the value of assets in the business. According to Mr. Stephens, if Ellvog had been paying rent to Mr. Gerson, the business would have virtually no value.
Expert Harold A. Asher
The Gerson Defendants' expert at trial was Harold A. Asher, who is a CPA, a certified valuation analyst, a certified fraud examiner, and a forensic CPA. Mr. Asher is accredited in business valuation, and is certified in financial forensics. In the four years prior to this proceeding, Mr. Asher testified as an expert at trial and/or was deposed in at least 65 matters. Mr. Asher was retained by the Gerson Defendants to determine the full extent of their losses -- other than the value of the real estate -- actually incurred because of the expropriation.
*644 In preparing his October 8, 2014 report, Mr. Asher relied on the following assumptions:
• The State of Louisiana began the expropriation process for Ellvog's real estate prior to February 4, 2010. As such, Ellvog incurred damages for the fiscal year ended May 31, 2010.
• Had the expropriation not occurred, Ellvog would have generated Income Before Officer's Compensation (or Discretionary Cash Flow to Owner as described by Daigle) for fiscal year ending May 31, 2010 of $63,250.00 (the amount determined by Daigle on behalf of the defendants in this matter).
• Ellvog would have continued to operate through May 31, 2020 at the expropriated location.
• At that time, Ellvog would have sold its operations in June 2020 at a value determined by applying a capitalization rate of 17.5% (the same rate determined by Daigle on behalf of the defendants in this matter) to the appropriate Income Before Officer's Compensation.
• Ellvog would have experienced an annual growth rate in its Income Before Officer's Compensation of 2.5% during the periods subsequent to May 2010 through May 2020.
• Ellvog's actual Income Before Officer's Compensation for the fiscal years ended Mary 31, 2010 through May 31, 2014 is reflected on Exhibits 1 and 3. Exhibit 3 reflects Ellvog's actual net income and discretionary cash flow for the fiscal years ended May 2004 through 2014.
• We have assumed that Ellvog will actually generate no Income Before Officer's Compensation subsequent to May 31, 2014.
• We have used a 2.5% discount rate in determining the present value of Ellvog's future damages from the date of this report.
• We have used May 31, 2014 as the reference date of this report for determining past losses.
In connection with his analysis, Mr. Asher reviewed the following documents:
• Federal tax returns of Ellvog for the fiscal years ended May 31, 2008 through May 31, 2014.
• Compiled financial statements for the fiscal years ended May 31, 2008 through May 31, 2014.
• Michael A. Daigle's February 4, 2010 report.
• Ralph Stephens' report dated September 17, 2013.
• Ralph Stephens' deposition dated October 3, 2013.
• GDP for the New Orleans Metropolitan Area for the period 2001 through 2013.
• City of New Orleans Annual Operating Budgets for 2013 and 2014.
• Monthly Hotel Tax Collections for the City of New Orleans Convention and Visitors bureau for 2004 through 2012.
• Daily Treasury Yield Curve Rates for September 2014 prepared by the U.S. Department of the Treasury.
• Ibbotson SBBI - 2014 Classic Yearbook published by Morningstar.
• Consumer Price Index - August 2014 published by the Bureau of Labor Statistics U.S. Department of Labor.
• The Livingston Survey release June 2014 published by the Federal Reserve Bank of Philadelphia.
• AICOA Practice Aid 06-4, Calculating Lost Profits.
*645 • Valuing a Business, Fifth Edition by Shannon P. Pratt.
• Journal of Forensic Economics 19(1), 2006, pp. 61-81, Worklife in a Markov Model with Full Time and Part Time Activity authored by Kurt B. Krueger. Gary R. Skoog, James E. Ciecka by the National Association of Forensic Economics.
• Michael W. Truax report dated February 8, 2010; Kevin D. Hilbert report dated April 7, 2011.[2]
At trial, Mr. Asher testified that the most appropriate methodology in this case was a loss of profit calculation, which involves determining the cash that would have come to Mr. Gerson had the taking not occurred (which Mr. Asher called "But For" Income), and comparing that to the loss actual realized, with the difference being his lost profits.
Mr. Asher provided two alternate damage calculations, one more conservative than the other. Mr. Asher's first scenario used the $63,250.00 DCF calculated by the Board's expert, Mr. Daigle, for the fiscal year ending May 31, 2010, which is when Ellvog's cash flow began to be impaired. Mr. Asher assumed that the $63,250.00 figure would grow at a 2½ percent rate between 2010 and 2014. Mr. Asher subtracted Ellvog's actual 2010 income taken from its tax return, $1,830.00, from the $63,250.00 "But For" Income, leaving a lost income figure of $61,420.00 for 2010. Mr. Asher repeated this calculation for each of the fiscal years 2011 through 2020, when Mr. Gerson intended to retire and sell the business.
Using Mr. Daigle's DCF of $63,250.00, Mr. Asher calculated the total lost income from May 31, 2010 through May 31, 2014 as $430,440.00. Mr. Asher then calculated Ellvog's future lost income from June 1, 2014 through May 31, 2020 as $418,897.00, using a discount rate of 2½ percent. Mr. Asher added in the "Terminal Value" of $408,923.00, which is the value of the real estate and hard assets of the business in June 2020, when Mr. Gerson intended to retire and sell the business. Mr. Asher added together the lost income from fiscal years 2010 through 2020 ($849,337.00) and the "Terminal Value" ($408,923.00), which resulted in a present value of lost income of $1,258,260.00. Mr. Asher then subtracted the $365,000.00 already paid to the Gerson Defendants, resulting in "unpaid damages" in the amount of $893,260.00. This is Exhibit 1 to Mr. Asher's report, which uses a $63,500.00 "But For" Income:
*646 Exhibit 1
Ellvog Inc
Unpaid Damages
"But For" Actual Lost Present Value Damages Year Income Income Income PV Factor Annual Cumulative 2010 63,250 1,830 61,420 1.0000 61,420 61,420 2011 64,831 10,784 54,048 1.0000 54,048 115,467 2012 66,452 (51,752) 118,204 1.0000 118,204 233,672 2013 68,113 (26,659) 94,772 1.0000 94,772 328,444 2014 69,816 (32,180) 101,996 1.0000 101,996 430,440 _________ Total thru 5/31/14 430,440 2015 71,562 - 71,682 0.9756 69,816 500,256 2016 73,351 - 73,351 0.9518 69,816 570,072 2017 75,184 - 75,184 0.9286 69,816 639,889 2018 77,064 - 77,064 0.9060 69,816 709,705 2019 78,991 - 78,991 0.8839 69,816 779,521 2020 80,965 - 80,965 0.8823 69,816 849,337 _________ Total 6/1/14 thru 5/31/20 418,897 Terminal Value 474,226 0.8623 408,923 1,258,260 _________ Present Value of Lost Income 1,258,260 Previous Payments (365,000) _________ Unpaid Damages 893,260
At trial, Mr. Asher discussed an alternative, more "conservative" damage analysis, in which he calculated 2010 "But For" Income of $45,000.00, which was close to the actual income for 2009, the year before the taking ($45,460.00).[3] Using the same methodology described above, Mr. Asher calculated the total lost income from May 31, 2010 through May 31, 2014 as $334,512.00. Mr. Asher then calculated the future lost income between June 1, 2014 and May 31, 2020 as $298,029.00 (using a discount rate of 2½ percent). Mr. Asher added the sum of the 2010 through 2020 lost income figures ($632,541.00) to the $290,934.00 "Terminal Value" of the real estate and the business's hard assets at the time of Mr. Gerson's planned retirement and sale of the business in June 2020, resulting in a present value of lost income of $923,475.00. Mr. Asher then subtracted the $365,000.00 already paid to the Gerson Defendants, leaving "unpaid damages" in the amount of $558,475.00. This is Exhibit 2 to Mr. Asher's report, based on his own alternative, "conservative" "But For" Income of $45,000.00:
*647 Exhibit 2
Unpaid Damages
Alternative Scenario
"But For" Actual Lost Present Value Damages Year Income Income Income PV Factor Annual Cumulative 2010 45,000 1,830 43,170 1.0000 43,170 43,170 2011 46,125 10,784 35,341 1.0000 35,341 78,511 2012 47,278 (51,752) 99,030 1.0000 99,030 177,641 2013 48,460 (26,659) 75,119 1.0000 75,119 252,660 2014 49,672 (32,180) 81,852 1.0000 81,852 334,512 ________ Total thru 5/31/14 334,512 2015 50,913 - 50,913 0.9756 49,672 384,184 2016 52,186 - 52,186 0.9518 49,672 433,866 2017 53,491 - 53,491 0.9286 49,672 483,527 2018 54,828 - 54,828 0.9060 49,672 533,198 2019 56,199 - 56,199 0.8839 49,672 582,870 2020 57,604 - 57,604 0.8623 49,672 632,541 ________ Total 6/1/14 thru 5/31/20 298,029 Terminal Value 337,394 0.8623 290,934 923,475 ________ Present Value of Lost income 923,475 Previous Payments (365,000) ________ Unpaid Damages 558,475
At the conclusion of the trial, the court ultimately awarded the Gerson Defendants $558,475.00 in damages, rejecting Mr. Stephens's valuation, and finding that the evidence supported Mr. Asher's alternative, more conservative valuation.
Assignments of Error
The Board identifies the following assignments of error:
1. The trial court erred in finding that Mr. Gerson and Ellvog were a single business enterprise for the purpose of determining loss of profits as a result of the expropriation.
2. The trial court erred in denying the Board's Motion for Summary Judgment because the value of the land and improvements exceeded the value of the business as of the time of the taking.
3. The trial court erred by awarding speculative lost profits by accepting the conclusions of expert Harold Asher, which were fundamentally flawed and contrary to the evidence.
4. The trial court erred by awarding an excess amount of lost profits to Mr. Gerson and Ellvog.
5. The trial court erred in awarding future lost profits because Mr. Gerson and Ellvog failed to mitigate their damages by continuing to operate the business.
Assignment of Error No. 1: The trial court erred in finding that Mr. Gerson and Ellvog were a single business enterprise
The Board contends that the trial court erred in accepting Mr. Asher's damages calculation that was based on the "faulty premise" that Mr. Gerson and Ellvog were a single business enterprise. According to the Board, Ellvog is a Louisiana a "C" corporation and, therefore, is a separate legal entity from Mr. Gerson. The Board notes that Ellvog files its own tax returns, while Mr. Gerson is an employee *648 of Ellvog, receives a W-2 form from Ellvog, and files an individual tax return.
Mr. Stephens testified that Ellvog should have been paying rent to Mr. Gerson because Ellvog and Mr. Gerson were separate entities. According to Mr. Stephens, if Ellvog had been paying $30,000.00 in rent to Mr. Gerson (the annual rent at the new location), then Ellvog would not be "worth anything."
At trial, however, Mr. Stephens admitted that, when doing a business valuation, there is no standard that requires separation of the ownership of an individual and the ownership of a corporation in which the individual is the sole shareholder. And although the Board argues that the trial court committed reversible error by failing to follow the law, it does not cite any authority to support the contention that Mr. Gerson and Ellvog must be treated as separate entities when assessing business losses.
The total economic impact of the expropriation ultimately flowed to Mr. Gerson, as the owner of the land and improvements, and as the sole shareholder of Ellvog. Because all of the benefit of the combined land/business operation flowed to Mr. Gerson, we conclude that the trial court was not manifestly erroneous in finding that Mr. Gerson and Ellvog were a single business enterprise for the purpose of calculating damages.
Assignment of Error No. 2: The trial court erred in denying the Board's Motion for Summary Judgment because the value of the land and improvements exceeded the value of the business as of the time of the taking.
The Board argues that the trial court erred as a matter of law when it failed to grant the Board's Motion for Summary Judgment on the issue of business losses. According to the Board, the Gerson Defendants are not entitled to be compensated for the value of the Property and the value of the business's future income stream because that would constitute "double recovery." The Board contends that the Gerson Defendants were entitled to be compensated $365,000.00 as owner of the land and improvements or $361,500.00 as the owner of the future income stream from the business.
We disagree. This same "double recovery" argument was rejected by this Court in Board of Supervisors of Louisiana State Univ. & Agric. & Mech. College v. Villavaso , 14-1277 (La. 4 Cir. 12/23/15), 183 So.3d 757. In Villavaso , the Board argued that the trial court erred in awarding the owner the fair market value of the property and the business losses resulting from the taking because it "amounted to an impermissible double recovery." This Court found no merit in the Board's argument:
The Louisiana Supreme Court has found that landowners are not limited to the market value of the property taken, and business losses are recoverable in certain cases, based upon a consideration of the totality of the circumstances surrounding the expropriation.
Id. , 14-1277, p. 10, 183 So.3d at 764 (citing State Dept. of Highways v. Constant , 369 So.2d 699 (La. 1979) ; State Dept. of Transp. & Dev. v. Dietrich , 555 So.2d 1355 (La. 1990) ).
The cited Supreme Court cases, Constant and Dietrich , make it clear that the phrase "to the full extent of his loss" means that an owner is entitled to the fair market value of his expropriated property, in addition to the incidental and consequential economic losses sustained by the owner's business as a result of the taking. See Constant , 369 So.2d at 702 ("The very purpose of the constitutional language was to compensate an owner for any loss he *649 sustained by reason of the taking, not restricted ... to the market value of property taken.").
This assignment of error is without merit.
Assignment of Error No. 3: The trial court erred by awarding speculative lost profits by accepting the conclusions of expert Harold Asher, which were fundamentally flawed and contrary to the evidence .
The Board contends that the trial court abused its discretion in awarding purely speculative lost profits by accepting the conclusions of Mr. Asher that were based on assumptions and methodologies that are fundamentally flawed and contrary to the evidence presented at trial.[4]
Weight of Expert Testimony
We begin by discussing the weight to be given experts. "The opinions of experts regarding valuation are advisory and are used only to assist the court in determining the amount of compensation due in an expropriation case." West Jefferson Levee Dist. v. Coast Quality Constr. Corp., 93-1718 (La. 5/23/94), 640 So.2d 1258, 1277. "The weight to be given to expert testimony is determined by the trier of fact based on the professional qualifications and experience of the expert, the facts and studies upon which his opinion is based, his familiarity with the locality of the property involved, and the possible bias of the witness in favor of the side for whom he testifies." Id. "Where the experts disagree as to the value of the property taken, the trial court has much discretion in evaluating and determining the weight to be given to each expert." Id. "The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." Villavaso , 14-1277, p. 6, 183 So.3d at 762.
The general methodology used by Mr. Asher was the income approach. As an initial matter, we note that the Supreme Court in Constant recognized that income figures from a defendant's business may afford an appropriate basis for a pecuniary award for a business's loss occasioned by the taking of immovable property. Constant , 369 So.2d at 704-05. The income/DCF model has been described as follows:
A DCF model assigns a value to a corporation by projecting its future cash flows or income streams (based on the corporations [sic] present and past cash flows and its projected growth rate), determining the present value of those future income streams (by assigning an appropriate discount rate and performing a present value calculation), and then summing up those income streams.
Peltz v. Hatten , 279 B.R. 710, 725 (D. Del. 2002).
"Many authorities recognize that the most reliable method for determining the value of a business is the [DCF] method." Lippe v. Bairnco Corp. , 288 B.R. 678, 689 (S.D.N.Y. 2003) (citing Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186 (7th Cir.1993) ; Shannon P. Pratt et al. , Valuing a Business: The Analysis & Appraisal of Closely Held Companies 154 (4th ed. 2000) ).
Second, according to the Board, Mr. Asher had no factual justification for using the $45,000.00 annual DCF, as of December *650 31, 2009, the year before the taking, as the cornerstone of his alternative damages calculation. The Board argues that Mr. Asher should have used the actual data from 2010 and 2011.
Mr. Gerson testified that the impact of the expropriation of neighboring properties had left his business stranded beginning in 2009. Mr. Asher testified that Mr. Gerson was first impacted by the expropriation in 2010, and from 2010 onward, the DCF was in a "definite spiral." We agree with the Gerson Defendants that the use of financial performance data for later periods would improperly include the impacts of the expropriation itself.
Third, the Board contends that Mr. Asher erred by applying a discount rate of 2½ percent in determining the present value of Ellvog's future damages. According to the Board, because there has been no history of a sure and steady increase in Ellvog's profits or cash flow, this assumption is purely speculative.
When calculating the value of an anticipated cash flow stream pursuant to the DCF method, the discount rate performs two functions: (1) it accounts for the time value of money; and (2) it adjusts the value of the cash flow stream to account for risk. Energy Capital Corp. v. U.S. , 302 F.3d 1314, 1333 (Fed. Cir. 2002) (citing Richard A. Brealey and Steward C. Myers, Principles of Corporate Finance , p. 244 (6th ed. 2000) ).
Mr. Asher testified that his 2½ percent inflation rate was "conservative." He said that he used that growth rate to determine the "rate of return that Mr. Gerson [could] get by taking the lump sum that the judge determine[d] represent[ed] the future damages, putting it in an investment and draw[ing] those funds out so that the withdrawal match[ed] the losses each and every year." To underscore the conservative nature of his 2½ percent discount rate, Mr. Asher looked at the specific circumstances of the New Orleans economy. Using the City of New Orleans' (the "City") operating budget, which he said used the "best information," Mr. Asher testified about the increases in the City's actual and projected sales tax revenues between 2009 and 2019. Mr. Asher also looked at increases in the City's GDP, concluding that "Ellvog's revenue growth during the 2 year period leading up to the impact of the expropriation materially exceeded the growth in inflation, sales taxes generated by the [City] and the GDP for the Greater New Orleans area." Mr. Asher also reported:
The 2010 revenue used in our calculations is 5.2% above the pre-Katrina revenues experienced by Ellvog (while the GDP for the GNO area increased approximately 16% over that same period. Note also that the sales tax growth in 2010 was 10.15% for New Orleans and the GDP growth was 13.72% while inflation increased by 1.5%).
"The appropriate discount rate is a question of fact." Energy, 302 F.3d at 1333 (citing Robert L. Dunn, Recovery of Damages for Lost Profits § 6.25 (5th ed. 1998); Monessen Southwestern Railway Co. v. Morgan , 486 U.S. 330, 341, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) ). See also Huggs, Inc. v. LPC Energy, Inc., 889 F.2d 649, 657 (5th Cir. 1989). Thus, "it is for the fact-finder to determine the method of adjusting for risk which most closely represents the value of damages." Energy , 302 F.3d at 1334. Accordingly, we find that the trial court was not manifestly erroneous in utilizing Mr. Asher's discount rate of 2½ percent.
Finally, the Board argues that the trial court erred by not adopting the conclusions of the Board's expert, Mr. Stephens, as set forth in his business valuation report. Mr. Stephens testified that Ellvog had no value at the time of its taking, *651 other than its portable assets valued at $39,806.00. He also testified that, because Ellvog had to pay $2,500.00 rent at its new location, it also could "no longer be viable" going forward.
At trial, the court heard two diametrically opposing views for evaluating the Gerson Defendants' business losses as a result of the taking. The Gerson Defendants' business loss expert, Mr. Asher, considered an income approach as the only way to fully compensate the Gerson Defendants for the full extent of their loss. As a result, Mr. Asher concluded that Ellvog suffered business losses of $558,475.00. The Board's expert, Mr. Stephens, concluded that an asset approach accurately showed that Ellvog only had a value of $39,806.00, the amount of its assets. The trial court was faced with conflicting testimony regarding the business losses sustained by the Gerson Defendants, and ultimately assessed the weight and credibility of the witnesses. "Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." Villavaso , 14-1277, p. 6, 183 So.3d at 762.
We find that the trial court's award of $558,475.00 in lost profits was reasonable and supported by the record. In it Reasons for Judgment, the trial court rejected the Board's position that there was only nominal compensation owed to what the Board termed a "failing business." The court especially noted that Ellvog has continued to exist long past the time of its relocation. Based upon the evidence, we cannot conclude that the trial court was clearly wrong in its award of damages. This assignment of error is without merit.
Assignment of Error No. 4: The trial court erred by awarding an excess amount of lost profits to Mr. Gerson and Ellvog
The Board argues that there are only two non-speculative grounds that may support an award of lost profits: (1) Ellvog's $110,591.00 in operating losses at its new location in the three full years of operation between the relocation of the business and the trial in January 2015; and (2) the $117,500.00 in rent paid by Ellvog for the 47 months between March 2011 and the trial. According to the Board, the trial court abused its discretion and committed reversible error by awarding damages to the Gerson Defendants in excess of the higher of these two amounts, which is $117,500.00. This argument is based on the Board's assertion that the trial court awarded damages in the amount of $558,475.00 based solely on Mr. Asher's totally "speculative" damages calculation in his alternative scenario.
For the reasons given in assignment of error number 3, we find that that Mr. Asher's calculation of business losses was not speculative. This assignment of error is also without merit.
Assignment of Error No. 5: The trial court erred in awarding future lost profits because Mr. Gerson and Ellvog failed to mitigate their damages by continuing to operate the business at another location.
The Board argues that the Gerson Defendants' business was "destroyed" by the expropriation because there was no reasonable chance of ever making a profit at the new location, which now requires Ellvog to pay rent. The Board then contends that "the exercise of reasonable prudence" mandated that Mr. Gerson shut down the Uniform Shop instead of deciding to move to a new location and continue to work until his planned retirement in 2020. According to the Board, because the operational losses that ensued for Ellvog were foreseeable and totally avoidable, Mr. Gerson failed to mitigate his damages and *652 the Board should not be liable for any losses incurred by Ellvog as a result of Mr. Gerson's decision to relocate and remain in business after the expropriation.
Louisiana courts have recognized that when an expropriation disrupts a business, the business has a duty to mitigate its damages. State, Dept. of Transp. & Dev. v. G & B Oil Prods, Inc. , 99-1248, p. 6 (La. App. 3 Cir. 6/21/00), 762 So.2d 1123, 1127 ; State, Dept. of Transp. & Dev. v. Nelken , 628 So.2d 1279, 1282 (La. App. 3rd Cir. 1993). Under Louisiana law, an injured party's duty to mitigate his damages requires him to exercise reasonable diligence and ordinary care in attempting to minimize his damage after he is aware of the damage and the injury. Gulf Coast Bank & Trust, Inc. v. Casse , 15-0657, 15-0658, p. 8 (La. App. 4 Cir. 4/27/16), 192 So.3d 845, 852, writ denied , 16-1000 (La. 9/16/16), 206 So.3d 211. The burden rests with the wrongdoer to show that the victim failed to mitigate damages. Id.
The Board cites no authority for its contention that a business owner is required to shut down his longstanding business in order to mitigate his damages allegedly resulting from the condemnor's "destruction" of his business. The record shows that Mr. Gerson's family business has been in continuous operation for nearly 80 years. Mr. Gerson has worked at the Uniform Shop since he was 12 years old. He testified that he enjoys what he does, which is what he "wake[s] up for." Mr. Gerson also stated that he works six days a week because he "love[s] it." According to Mr. Gerson, he intends to keep the Uniform Shop going until 2020, when he will retire at age 76 and sell his business.
The record also shows that Mr. Gerson began looking for a new location for his uniform business in 2008, when he learned about the expropriation of property in the medical center footprint. In March 2011, Ellvog leased a building about a mile away on Tulane Avenue, and Mr. Gerson moved his business into the premises in April 2011. As the trial court remarked, Ellvog "continued to exist long past the time of its relocation."
We find that the Board has not satisfied its burden of showing that Mr. Gerson failed to exercise reasonable diligence and ordinary care when he relocated and continued to operate his 80-year-old family business.
ATTORNEY'S FEES AND EXPERT FEES
Next, we turn to No. 2017-CA-0296, which is the Gerson Defendants' appeal of the trial court's July 25, 2016 judgment denying an award of attorney's fees, and its October 14, 2016 judgment limiting the award of expert costs incurred in the expropriation action.
The Gerson Defendants list two Assignments of Error:
1. The trial court erred as a matter of law in finding that under La. R.S. 19:8(A)(3), an award of attorney's fees is not appropriate to a party awarded compensation for business losses caused by expropriation, even when the highest amount offered by the expropriating party is less than the compensation awarded.
2. The trial court abused its discretion in failing to award the prevailing party appropriate costs of experts for testimony integral to the determination of liability and damages necessary to make that party whole.
Attorney's Fees
Following the rendition of the trial judgment in the amount of $558,475.00, the Gerson Defendants filed a Motion for New Trial on the issue of attorney's fees and expert fees. At the June 5, 2015 hearing on *653 attorney's fees, the trial court stated that, because the parties had stipulated to the value of the real estate, and the only issue for trial was the alleged business loss, attorney's fees were not an appropriate part of the award:
I don't think anybody disagrees with the assessment of the characterization of the losses [$558,475.00] and business losses. The question becomes whether or not those business losses can be property losses as envisioned by [ La. R.S. 19:8 ], and I'm going to be honest with you, I think it's a novel question and a novel issue and I'm going to deny the Motion for New Trial. I'm going to let you take it up.
La. R.S. 19:8(A)(3) provides:
Immediately after compensation has been determined, the plaintiff shall, upon motion of the defendant, present evidence as to the highest amount it offered the defendant for the property and severance damages, if any, prior to the trial on the merits. After hearing evidence on the issue, the court shall determine the highest amount offered. If the highest amount offered is less than the compensation awarded for the property and severance damages, if any, the court may award reasonable attorney fees to the defendant. [Emphasis added.]
The Board argues that the trial court was correct in finding that the Gerson Defendants are not entitled to attorney's fees under La. R.S. 19:8(A)(3) because the term "property" used in the statute is defined as "immovable property," as provided in La. R.S. 19:1(A) :
As used in this part, the term "property" means immovable property , including servitudes and other rights in or to immovable property. [Emphasis added.]
A statute shall be construed to give meaning to its plain language. Vogt v. Bd. of Comm'rs of the Orleans Levee Dist. , 95-1187, p. 10 (La. App. 4 Cir. 9/4/96), 680 So.2d 149, 155. Thus, when the law is clear and unambiguous and its application does not result in absurd consequences, it shall be applied as written. Id.
The plain language of the statute shows that La. R.S. 19:8(A)(3) does not apply in this case because the highest amount offered to the Gerson Defendants for the "immovable" property ($365,000.00) was the same amount of compensation ultimately awarded for the "immovable" property.[5] This does not, however, mean that the Gerson Defendants are not entitled to be compensated for their reasonable attorney's fees.
As discussed above, under the Louisiana Constitution, a landowner whose property is expropriated is entitled to be compensated "to the full extent of his loss." The Gerson Defendants contend that they are entitled to attorney's fees as part of their constitutional right to compensation "to the full extent of [their] loss." See LA. CONST. art. 1, § 4 (B)(5). We agree. A successful defendant in any expropriation must be placed in the same pecuniary position in which he would have been if the property had not been taken. Constant , 369 So.2d at 702. We find that if *654 reasonable attorney's fees are not awarded to the Gerson Defendants, they will not be in the same "pecuniary position" as they would be prior to the taking because their award will have been effectively reduced by the attorney's fees that they will have to pay for successfully seeking compensation.
Thus, we endorse an approach to the payment of attorney's fees in expropriation actions that "makes a landowner truly whole." Villavaso , 14-1277, p. 11, 183 So.3d at 764. Our conclusion is supported by a line of decisions from this Court, as well as the legislative history of Art. 1, § 4 taken from the 1973 Constitutional Convention.
In Bd. of Comm'rs of New Orleans Exhibition Hall Auth. v. Missouri Pac. RR Co. , this Court declared that a landowner "is entitled to" attorney's fees as part of the compensation "to the full extent of his loss," which is mandated by the constitution. Id. , 625 So.2d 1070, 1082 (La. App. 4th Cir. 1993), as clarified on reh'g (Nov. 18, 1993), writ granted , 627 So.2d 638 (La. 1993), writ denied , 627 So.2d 638 (La. 1993), writ denied , 630 So.2d 802 (La. 1994). See also Gravolet v. Bd. of Comm'rs for Grand Prairie Levee Dist. , 598 So.2d 1231, 1236 (La. App. 4th Cir. 1992) ("The measure of damages in an expropriation case ordinarily includes attorney's fees incurred by the landowner in connection with the expropriation."); Consol. Sewerage Dist. of City of Kenner v. Schulin , 387 So.2d 1369, 1373 (La. App. 4th Cir. 1980) ("It is clear to this court that the legislative intent relative to the phrase 'to the full extent of his loss' was meant to include an award of attorney's fees to the landowner in expropriation cases under Article I, § 4 of the Constitution of 1974."); Pointe Coupee Elec. Membership Corp. v. Mounger , 447 So.2d 1104, 1111 (La. App. 1st Cir. 1984) ("There can be no doubt that legal costs of an expropriation proceeding come within the constitutional guarantee of just and adequate compensation to the landowner.").
The "legislative intent" is reflected in the records of the Louisiana Constitutional Convention of 1973:
The phrase "the full extent of his loss" was in the original committee proposal and was continued in the final compromise. The author of the provision, Delegate Louis Jenkins, insisted on using the term "his loss" rather than "the loss" in order to indicate that consideration be given to the property owner's subjective intangible losses rather than merely to objective determinations. Shortly after the convention, Jenkins set forth what the provision "full extent of his loss" was designed to include. He wrote:
The amount of compensation to be paid when property is taken is not merely "just compensation" as that term has been understood under the fifth and fourteenth amendments of the Federal Constitution and the 1921 State Constitution. Instead, the owner must be compensated "to the full extent of his loss." This is intended to include things "which, perhaps, in the past may have been considered damnum absque injuria, such as cost of removal," attorney fees , inconvenience, loss of aesthetic value or business profits and so forth. The loss to be measured is the loss sustained by the owner himself. The Section very carefully says that the owner is to be compensated "to the full extent of his loss" instead of "to the full extent of the loss" (emphasis added). In other words, the compensation is to be determined subjectively with emphasis on the value placed on the property by the owner instead of on its so-called market value or replacement cost.
*655 This emphasis will generally require compensation to be much greater than in the past.
Howard, Louisiana Expropriation Cases (emphasis added).
According to Delegate Lewis Jenkins:
[S]uppose a highway comes across the corner of your property. You are offered five hundred dollars for it; it's worth a thousand. At present, there is no way you can get what it's worth because if you go to court and challenge that offer and try to get your thousand dollars, and even if you win, you are going to lose, because of the cost of going to court, hiring an attorney, which you'll have to pay. So this would be an attempt to take into account that fact .
Lynda J. Oswald, Goodwill and Going-Concern Value, Emerging Factors in the Just Compensation Equation , 32 B.C. L. REV. 283, 357 & n.418 (1991) (emphasis added).
We conclude that the denial of compensation for attorney's fees incurred in obtaining damages for business losses resulting from an expropriation is an error of law.
At the June 2015 hearing on the Gerson Defendants' Motion for New Trial, there was no evidence presented because the trial court denied the Gerson Defendants' request for attorney's fees on the grounds that La. R.S. 19:8 did not authorize an award of attorney's fees when the parties to an expropriation have stipulated to the value of the expropriated real property, and the only issue at trial is the extent of business losses.
In November 2015, the Gerson Defendants filed a "Post-Hearing Submission on Litigation Costs and Attorney's Fees." One of the exhibits attached to the brief was a one-page "Transaction Summary Report" by Herman, Herman & Katz, LLC, listing only names of "professionals" and "unit" numbers totaling 769.
The amount of reasonable attorney's fees should be determined after an evidentiary hearing. Gootee Constr., Inc. v. Atkins , 15-0376, p. 17 (La. App. 4 Cir. 11/4/15), 178 So.3d 629, 639. Because there was no evidentiary hearing on the issue of attorney's fees, the current record does not permit us to decide the amount of reasonable attorneys' fees that should be paid. Accordingly, this matter is remanded to the trial court to take evidence and award reasonable attorney's fees based on the Supreme Court's Williamson factors.[6]
Expert Fees Under La. R.S. 13:3666
The Gerson Defendants contend that, in light of the time, effort, experience and the importance of Mr. Asher's testimony to the outcome of this matter, the trial court should have awarded $51,820.00 in expert fees billed by Mr. Asher through the trial, rather than the $7,500.00 actually awarded.[7] They also contend that the trial court *656 should have awarded Mr. Pappalardo's billed expert fees in the amount of $8,165.00, rather than $1,500.00. The trial court gave no indication as to how each expert fee award was calculated, which for Mr. Asher is about 15 percent of the fees sought, and for Mr. Pappalardo is about 19 percent of his fees.
Standard of Review
A trial court has great discretion in awarding expert witness fees, and can only be reversed on appeal upon a showing of an abuse of that discretion. FIE, LLC v. New Jax Condo Ass'n, Inc. , 16-0843, 17-0423 (La. App. 4 Cir. 2/21/18), 241 So.3d 372, 404, writ denied , 18-0449 (La. 5/25/18), 243 So.3d 544, writ denied , 18-0446 (La. 5/25/18), 243 So.3d 545.
La. C.C.P. art. 1920 provides that "the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." La. R.S. 13:3666(A) sets forth the general rule regarding the compensation of experts:
Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill acquired.
"Expert witness fees for testifying at trial and for time spent preparing for that testimony are recoverable." Bayou Fleet, Inc. v. Bollinger Shipyards, Inc. , 15-0487, 15-0702, p. 21 (La. App. 4 Cir. 7/21/16), 197 So.3d 797, 811. The amount actually billed by the expert is not determinative of the reasonable amount taxable as costs. Id. , 15-0487, pp. 21-22, 197 So.3d at 811. "The determination of the reasonableness of an expert fee award turns on the particular facts and circumstances of the case." Id. , 15-0487, p. 22, 197 So.3d at 811.
Although it is a case-specific determination, courts have identified multiple factors to consider in determining a reasonable expert fee award, including the following: (1) the amount of time consumed by the expert in compiling his or her report; (2) the amount charged to the client; (3) the amount of time spent preparing for trial; (4) the amount of time spent in court; (5) the expert's expertise; (6) the difficulty of the expert's work; (7) the amount of the award; and (8) the degree to which the expert witness's opinions aided the court in its decision. Id.
On October 7, 2016, the trial court conducted an evidentiary hearing on the Gerson Defendants' request for expert fees. Mr. Asher and Mr. Pappalardo testified and 179 pages of exhibits were introduced.
Mr. Asher produced a "Time and Billing Analysis" reflecting the work done by Mr. Asher. In 2013, Mr. Asher and Mr. Meyers spent 51 hours doing the following: (1) updating Mr. Asher's 2010 report; (2) preparing for and attending depositions; (3) preparing for Mr. Stephens' deposition; (4) meeting with counsel; (5) preparing a memorandum on Certainty Equivalent (discount rate); (6) preparing a rebuttal report of Mr. Stephens; (7) preparing for and attending Daubert hearing; (8) meeting with counsel and document review; (9) reviewing financial documents; and (10) preparing for trial. Mr. Asher's total invoices for 2013 were $26,475.00. In 2014, Mr. Asher and Mr. Meyers spent 29 hours as follows: (1) updating report; (2) preparing for trial; and (3) updating rebuttal report of Mr. Stephens. Mr. Asher's total invoices for 2014 were $11,425.00. In 2015, Mr. Asher and Mr. Meyer spent 36 hours as follows: (1) preparing for trial; (2) preparing trial binders; and (3) preparing for, *657 attending, and testifying at trial. Mr. Asher's total invoices for 2015 were $13,920.00.
In this matter, Mr. Asher billed a total of 140 hours, and the invoices for his work totaled $51,820.00.[8]
The Gerson Defendants contend that they retained Mr. Asher to apply his extensive experience to calculate the business losses sustained due to the expropriation of the Property. Mr. Asher was also retained to evaluate and respond to the valuation performed by the Board's experts, Mr. Daigle and Mr. Stephens. They point out that Mr. Asher prepared five reports, reviewed multiple opposing expert reports, gave his deposition, testified at the Daubert hearing, and prepared for trial, which was reset multiple times.
In its Reasons for Judgment, the trial court expressed the importance of Mr. Asher's work to the result obtained. The trial court explained that its $558,475.00 damage award was "consistent with Ellvog's [Mr. Asher's] alternative calculation," which the court found to be "a reasonable and credible one." In its judgment, the trial court adopted Mr. Asher's calculation of a past loss of $334,512.00; a future loss of $298,029.00; and a business valuation of $290,934.00. As Mr. Asher had done, the trial court then deducted the $365,000.00 already paid for the Property. It is clear that Mr. Asher's reports and testimony at trial aided the court in its decision, given that the trial court accepted Mr. Asher's conservative damages figure based on his calculation of business losses.
Examination of the record in this case convinces us that the trial judge abused its discretion in not awarding a higher expert fee to Mr. Asher that is more commensurate with the actual time expended in out-of-court preparation and trial appearance. Mr. Asher's written reports contained in the record demonstrate the thoroughness and quality of the work performed and the time obviously invested by Mr. Asher and Mr. Meyers to gather useful data. We also note that Mr. Asher was subjected to extensive cross-examination by the Board in his deposition and at trial. Accordingly, we amend the October 14, 2006 judgment and award Mr. Asher $45,000.00 in expert fees.[9]
As for Mr. Pappalardo's expert fees, the Gerson Defendants submitted a Statement of Account for work done by Mr. Pappalardo on behalf of Ellvog, which listed invoices totaling $8,165.00. Mr. Pappalardo also submitted copies of his invoices. The trial court awarded $1,500.00 in expert fees to Mr. Pappalardo. Although Mr. Pappalardo was retained to advise Mr. Gerson with respect to the fairness of the price offered by the Board for the Property, Mr. Pappalardo prepared a report and testified at trial that he did not think that the amount of money being presented to Mr. Gerson compensated him completely for the dislocation of his business, and that "there was something missing in the pure valuation." Mr. Pappalardo's opinions supplied the foundation for Mr. Asher's calculation of business loss: "[M]y opinion was that this was a very special and unique property and that it required further examination *658 and for Ellvog and Mr. Gerson to be made whole that it required some examination of the business enterprise."
We find that the trial court abused its discretion in awarding $1,500.00 for Mr. Pappalardo's expert fees. We amend the October 14, 2016 judgment, and award Mr. Pappalardo $5,000.00 in fees.
CONCLUSION
For the forgoing reasons, we affirm the trial court's April 6, 2015 judgment awarding the Gerson Defendants $558,475.00 in damages based on business losses caused by the expropriation. We reverse the trial court's July 25, 2016 judgment denying the Gerson Defendants' attorney's fees, and remand to the trial court for an evidentiary hearing and application of the Williamson factors to make an award of reasonable attorney's fees. Finally, we amend the trial court's October 14, 2016 judgment awarding Mr. Asher $7,500.00 in expert fees, increasing the fees to $45,000.00. We also amend the judgment awarding Mr. Pappalardo $1,500.00 in expert fees, increasing those fees to $5,000.00.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART, AMENDED IN PART
BELSOME, J., CONCURS IN THE RESULT
CHASE, J., CONCURS IN THE RESULT

The trial court found that Ellvog had $334,512.00 in past losses, $298,029.00 in future losses, and a business valuation of $290,934.00, so that Ellvog's total damages were $923,475.00. The trial court deducted from this amount the $365,000.00 already paid, leaving a net damage award of $558,475.00.

Mr. Truax and Mr. Hilbert are Louisiana Certified General Real Estate Appraisers retained by the Board to determine the value of the land and improvements based on the comparable sales approach. The amount offered and paid to the Gerson Defendants was based on the higher of the two appraisals ($365,000.00).

Mr. Asher calculated the $45,000.00 figure by subtracting expenses from fiscal year end May 2009 revenues (net income), and adding back the depreciation and officer's compensation.

On October 10, 2013, the Board filed a Daubert Motion/Motion in Limine ("Daubert Motion") to exclude the testimony of Mr. Asher. The Board argued that Mr. Asher's methodologies were extremely flawed and so deficient as to render his opinion unreliable. After an evidentiary hearing, the trial court rendered a judgment on December 10, 2013 denying the Board's Daubert Motion.

In contrast, under another statute governing expropriations by the Department of Transportation and Development, "reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment . Such attorney fees in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court." La. R.S. 48:453(E) (emphasis added). In such cases, the landowner may receive reasonable attorney's fees if the highest amount offered was less than the total compensation ultimately awarded.

The Supreme Court has set forth those factors to be taken into consideration by the trial court in determining the reasonableness of attorney's fees as follows: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. See State, Dept. of Transp. & Dev. v. Williamson, 597 So.2d 439 (La. 1992).

Mr. Asher's fees also include those of his assistant, Jeffrey E. Meyers, who is a statistician, a certified evaluation analyst, a certified fraud examiner, and has a master's degree in financial forensics.

At the time of trial, Mr. Asher's billing rate was $435.00 an hour, and Mr. Meyers' billing rate was $290.00 an hour.

In other expropriation actions by the Board to construct the LSU Medical Center, landowners were awarded expert fees of $321,704.68 (Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. College v. Southern Electronics, Inc. , 17-0722 (La. App. 4 Cir. 6/6/18), --- So.3d ----, 2018 WL 2716364 ); and $103,554.68 and $91,707 (Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. College v. 1732 Canal Street, L.L.C. , 13-0976 (La. App. 4 Cir. 1/15/14), 133 So.3d 109 ).